# United States Court of Appeals
## For the First Circuit

---

Nos. 14-1179
    14-1229

OLD REPUBLIC INSURANCE COMPANY,

Plaintiff, Appellant, Cross-Appellee,

v.

STRATFORD INSURANCE COMPANY,

Defendant, Appellee, Cross-Appellant.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Landya McCafferty, U.S. District Judge]

---

Before

Lynch, Chief Judge,
Howard and Barron, Circuit Judges.

---

Daniel W. Gerber, with whom Jonathan L. Schwartz, Goldberg Segalla LLP, Naomi L. Getman, Andrew R. Schulman, and Getman, Schulthess & Steere, P.A. were on brief, for appellant, cross-appellee.
Laurence J. Rabinovich, with whom Hiscock & Barclay LLP, Richard C. Nelson, and Nelson Kinder & Mosseau PC were on brief, for appellee, cross-appellant.

---

January 26, 2015

---

**LYNCH, <u>Chief Judge</u>**.  This appeal arises out of a dispute between two insurers as to their respective duties to defend and indemnify a tractor-trailer involved in an auto collision causing serious injuries.  The owner of the tractor, Ryder Truck Rentals ("Ryder"), obtained primary insurance for the tractor through Old Republic Insurance Company ("Old Republic").  The operator of the tractor, DAM Express ("DAM"), obtained separate insurance through Stratford Insurance Company ("Stratford").  Old Republic brought this suit to determine Stratford's insurance obligations.

The first question is whether the Stratford Policy is co-primary with the coverage provided by Old Republic for the tractor leased from Ryder.  The answer hinges on the intent of the contracting parties, and, more specifically, on which sources a court may consult to determine that intent under New Hampshire law.  We conclude that the district court committed no legal error in considering the Stratford Policy as a whole and turning to objective extrinsic evidence to resolve inconsistencies found therein.  We affirm the district court's conclusion that DAM and Stratford never intended the Stratford Policy to provide primary coverage to the tractor otherwise covered by Old Republic.

We must then determine Stratford's corresponding duty to defend as an excess insurer of the tractor.  The answer is far from clear under New Hampshire law.  The district court interpreted a New Hampshire case from 1991 as establishing a rule whereby an

-2-

insurer's duty to defend is the same regardless of whether its designation is as primary or excess. After a close analysis of New Hampshire precedent, we conclude that the best course of action is to certify this question of New Hampshire law to the New Hampshire Supreme Court.

## I.  Factual Background

On April 7, 2010, a tractor-trailer crashed into Daniel and Karla Bendor's vehicle in Connecticut, causing bodily injury. The tractor was owned by Ryder, who had leased it to DAM in order to transport a trailer owned by Coca-Cola. The driver, Antoine Girginoff, was employed by DAM.

DAM is a for-hire motor company which operates out of Manchester, New Hampshire. As described by the office manager, DAM's work "falls into two categories." "One category is small package delivery such as consumer goods which is conducted in vans and small trucks owned by D.A.M." When business is particularly busy, DAM rents an extra van of a similar type, for approximately $5,000 per year. "The second category [is] transportation of larger shipments in tractor-trailers." DAM leases these tractors from Ryder for approximately $240,000 per year.

DAM and Ryder's lease agreement specified that Ryder was responsible for obtaining liability insurance for the tractor. The lease agreement reads:

> A. Liability Insurance. The party designated on Schedule A (the "Insuring Party") agrees to

furnish and maintain, at its sole cost, a policy of automobile liability insurance with limits specified on each Schedule A for death, bodily injury and property damage, covering both you and Ryder as insureds for the ownership, maintenance, use, and operation of each Vehicle ("Liability Insurance"). . . . The Liability Insurance must provide that its coverage is primary and not additional or excess coverage over insurance otherwise available to either party . . . . The Insuring Party agrees to designate the other party as an additional insured on the Liability Insurance . . . .

On the form titled "Schedule A," the Insuring Party is identified as Ryder alone. DAM agreed that "Ryder shall have the sole right to conduct accident investigations and administer claims handling and settlements and [DAM] shall adhere to and accept Ryder's conclusions and decisions."

Ryder obtained liability insurance from Old Republic, under which Old Republic agreed to "pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto'" and to "defend any 'suit' asking for these damages." "Insureds" included Ryder "for any covered 'auto'" and "[a]ny person or organization for whom [Ryder] is obligated by written agreement to provide liability insurance . . . ." Covered "autos" included "any 'auto,'" the definition of which included "'[t]railers' with a load capacity of 2000 pounds or less designed

-4-

primarily for travel on public roads." For a coverage limit of $1,000,000, Ryder paid a premium of $459,961.

In a section titled "Other Insurance," Old Republic specified: "For any covered 'auto' you own, this Coverage Form provides primary insurance." "However, while a covered 'auto' which is a 'trailer' is connected to another vehicle, the Liability Coverage this Coverage Form provides for the 'trailer' is: . . . [p]rimary while it is connected to a covered 'auto' you own."

DAM separately obtained insurance from Stratford. Stratford agreed to "pay all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto,'" and to "defend any 'insured' against a 'suit' asking for such damages." The Stratford Policy specified three categories of vehicles as covered "autos:" (1) "specifically described 'autos,'" (2) "hired 'autos,'" and (3) "nonowned 'autos.'" For a maximum coverage of $1,000,000, DAM paid a premium of $4,808.

"Specifically described 'autos'" are defined as "[o]nly those 'autos' described in Item Three of the Declarations for which a premium charge is shown (and for Liability Coverage any 'trailers' [DAM doesn't] own while attached to any power unit described in Item Three)." Item Three lists two Chevy Express vans and "any non-owned trailer while attached to a covered auto."

"Hired 'autos'" are defined as "[o]nly those 'autos' [DAM] lease[s], hire[s], rent[s] or borrow[s]."  In Item Four, DAM estimated the cost of hire of these autos to be $5,000 per year. The $5,000 per year estimate yielded a liability premium of $400. "Nonowned 'autos'" are defined as "[o]nly those 'autos' [DAM] do[es] not own, lease, hire, rent or borrow that are used in connection with [DAM's] business."

In the "Other Insurance" section, the Stratford Policy specifies that it provides primary coverage for autos that fall into one of these three categories of covered autos.  It reads:

> This Coverage Form's Liability Coverage is primary for any covered "auto" while hired or borrowed by [DAM] and used exclusively in [DAM's] business as a "trucker" and pursuant to operating rights granted to [DAM] by a public authority.  This Coverage Form's Liability Coverage is excess over any other collectible insurance for any covered "auto" while hired or borrowed from [DAM] by another "trucker."  However, while a covered "auto" which is a "trailer" is connected to a power unit, this Coverage Form's Liability Coverage is:
>
> (1)  On the same basis, primary or excess, as for the power unit if the power unit is a covered "auto".
>
> (2)  Excess if the power unit is not a covered "auto".

The Bendors sued Ryder, DAM, and Girginoff in federal court in Connecticut on December 3, 2010, for damages in connection

with the April 7, 2010, accident.[1]  As required by its policy with Ryder, Old Republic immediately began providing a defense.  In March 2011, Old Republic asked Stratford to participate in the defense of its insureds.

In August 2011, after learning about the underlying lawsuit, Stratford proposed a general change endorsement to its policy with DAM that was retroactively "effective on the inception date of the policy."  That endorsement specified: "For a covered 'auto' leased or rented to [DAM] by [Ryder] or any related entity, LIABILITY COVERAGE is excess over any other collectible insurance."  Stratford and DAM executed the agreement on November 29, 2011.

By letter dated December 1, 2011, Stratford informed Old Republic that it had no obligation to share in the cost of defending or indemnifying its insureds against the underlying lawsuit.  Stratford's Senior Litigation Specialist, Sandra McFarlane, wrote that the "endorsement reflects [DAM]'s understanding that [it] had opted to purchase primary insurance for [its] Ryder vehicles through Ryder."  McFarlane stated that "[a]ny coverage provided to either DAM or Mr. Girginoff by Stratford is excess to the coverage provided by Ryder and/or Old Republic."  For this reason, McFarlane took the position that "Stratford is not . . . obligated to, and will not, share in the cost of defending or indemnifying [their] mutual insureds at this time."

---

[1]  Coca-Cola was subsequently added as a defendant.

-7-

## II. Present Litigation

Old Republic filed suit against Stratford on June 1, 2012, in state court in New Hampshire. Old Republic sought a declaratory judgment pursuant to New Hampshire Revised Statute § 491:22 et seq. that Old Republic and Stratford have co-primary obligations to defend and indemnify DAM, Girginoff, and Coca-Cola, with accompanying claims for equitable reformation, unjust enrichment, and waiver and estoppel. Stratford removed the case to the United States District Court for the District of New Hampshire, and counterclaimed for a declaratory judgment that Old Republic provides primary coverage, and Stratford provides excess coverage, for the liability of DAM, Girginoff, and Coca-Cola.

The district court granted in part and denied in part both parties' motions for summary judgment. Old Republic Ins. Co. v. Stratford Ins. Co., No. 12-cv-256-LM, 2014 WL 309390, at *1 (D.N.H. Jan. 27, 2014). The district court concluded that, as to the tractor, "the Stratford policy, as initially issued, did not require Stratford to provide primary coverage for any losses that may ensue in the underlying action." Id. at *5. Nevertheless, "because Stratford concedes that its policy provides excess coverage," the district court held that Stratford "is obligated to share equally in the costs of defending its insureds in the underlying action." Id. at *7. Old Republic's additional claims

for equitable reformation, unjust enrichment, and waiver and estoppel were dismissed.  Id.

Both parties appealed.  Old Republic argues that "the district court erred in finding that coverage under the Stratford Policy is excess over coverage under the [Old Republic] Policy." According to Old Republic, the plain language of the original policy made Stratford's coverage primary as to the tractor in addition to its own, and the subsequent endorsement changing the coverage to excess is invalid and unenforceable.  Stratford defends the district court's holding that it is an excess insurer, but contends that the district court erred in requiring it to share equally the costs of defense nonetheless.

We review the district court's grant of summary judgment under Federal Rule of Civil Procedure 56 de novo, and affirm "only if the record discloses no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011).  In this analysis, we view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.  Id.  The presence of cross-motions for summary judgment does not affect this analysis. Scottsdale Ins. Co. v. Torres, 561 F.3d 74, 77 (1st Cir. 2009).

### III. Stratford's Coverage

In New Hampshire, "[t]he fundamental goal of interpreting an insurance policy, as in all contracts, is to carry out the intent of the contracting parties." Bates v. Phenix Mut. Fire Ins. Co., 943 A.2d 750, 752-53 (N.H. 2008) (quoting Tech-Built 153, Inc. v. Va. Sur. Co., 898 A.2d 1007, 1009 (N.H. 2006)); see also Hansen v. Sentry Ins. Co., 756 F.3d 53, 61 (1st Cir. 2014). Analyzing the language of the policy and an extrinsic agreement, the district court concluded that DAM and Stratford never intended to provide co-primary coverage to the tractor DAM leased from Ryder. Old Republic, 2014 WL 309390, at *5-6.

The key question here under New Hampshire law is what sources a court may consult -- and in what circumstances -- to ascertain the parties' intent for coverage. "The interpretation of a contract, including whether a contract term is ambiguous, is ultimately a question of law . . . ." Birch Broad., Inc. v. Capitol Broad. Corp., 13 A.3d 224, 228 (N.H. 2010). "[T]o determine what the parties, as reasonable people, mutually understood the ambiguous language to mean necessarily involves factual findings . . . ." Id.

Our search for the parties' intent as to the coverage of the tractor begins with the words of the policy itself. Bates, 943 A.2d at 753. The New Hampshire Supreme Court recently summarized:

> In interpreting policy language, we look to the
> plain and ordinary meaning of the policy's

-10-

> words in context. We construe the terms of the policy as would a reasonable person in the position of the insured based upon more than a casual reading of the policy as a whole. Policy terms are construed objectively, and where the terms of a policy are clear and unambiguous, we accord the language its natural and ordinary meaning. . . .

White v. Vt. Mut. Ins. Co., No. 2013-569, 2014 WL 6533298, at *3 (N.H. Nov. 21, 2014) (quoting Bates, 943 A.2d at 753). In this inquiry, we are not constrained to the specific terms of the provision involved; we must read the policy "as a whole." See Great Am. Dining, Inc. v. Phila. Indem. Ins. Co., 62 A.3d 843, 848 (N.H. 2013).

To go beyond the four corners of the policy, however, generally requires ambiguity. See White, 2014 WL 6533298, at *3; Birch Broad., 13 A.3d at 228; Lawyers Title Ins. Corp. v. Groff, 808 A.2d 44, 48 (N.H. 2002). Clear and unambiguous policy language is generally the best evidence of the parties' intent, and courts do not lightly disregard it. See White, 2014 WL 6533298, at *3.

When faced with an internally inconsistent policy, the New Hampshire Supreme Court has looked to "objective extrinsic evidence," such as other agreements between relevant parties, to "conclusively resolve[]" the intent of the contracting parties. See Tech-Built, 898 A.2d at 1010. In Tech-Built, the New Hampshire Supreme Court considered a contract between Surge, an employee leasing company, and its insurer, Virginia Surety. Id. at 1008-09. At issue was whether Surge's Virginia Surety policy extended

-11-

coverage to Surge employees who were leased to Tech-Built, a corporation involved in the construction industry, or to Tech-Built itself. Id. at 1009. In the section titled, "Who Is Insured," the policy stated: "You are insured if you are an employer named in Item 1 of the Information Page." Id. The court "acknowledge[d] that Item 1 of the information page itself reference[d] Surge 'etal [sic]' and the '[o]ther workplaces' subsection reference[d] the endorsement entitled 'Additional Named Insured and/or Locations.'" Id. (third and fourth alterations in original). The endorsement in turn listed over 150 companies, including Tech-Built. Id. The court noted, however, that "[o]ther language within the policy itself . . . reveal[ed] that the contracting parties anticipated that a single employer was named as the insured, namely Surge, and that coverage for that employer extended to all 'workplaces' of that employer listed in the endorsement . . . ." Id. at 1009-10. In examining the entire policy, the court found a lack of clarity as to what the parties intended. See id.

The New Hampshire Supreme Court used Surge's leasing agreement with Tech-Built to "inform[]" its understanding of the Virginia Surety Policy. Id. at 1011. The court concluded that Surge's leasing agreement with Tech-Built "memorialized" Surge's "clear intent . . . to secure workers' compensation coverage only for its leased employees." Id. at 1010. The court recognized that, "in general, we do not look beyond the four corners of the

insurance contract to discern the intent of the contracting parties regarding the scope and extent of insurance coverage." Id. But, the court explained, "we will not ignore that [objective extrinsic] evidence in favor of dogmatic adherence to insurance maxims." Id.

In this case, the Stratford Policy provides primary insurance coverage to three categories of "autos," including, as is relevant here, "hired 'autos.'" "Hired 'autos'" are defined as "those 'autos' [DAM] lease[s], hire[s], rent[s] or borrow[s]." The Stratford Policy states that "[t]his Coverage Form's Liability Coverage is primary for any covered 'auto' while hired or borrowed by [DAM] and used exclusively in [DAM's] business as a 'trucker' . . . ."

To repeat, DAM leased or rented two types of vehicles in the course of its business. First, DAM rented small vans, similar to those it owned, for approximately $5,000 per year to deliver small packages during busy periods. Second, DAM leased large tractors from Ryder for approximately $240,000 per year to transport palletized freight. There is no dispute that the parties intended the Stratford Policy to provide primary coverage for the small vans DAM owned and rented. We must determine whether the parties intended the policy's primary coverage to also extend to the large tractors leased from Ryder.

If we were to confine our consideration to only the definition of "hired 'autos,'" primary coverage would apply to the

large tractors in the same way as the small vans.[2]  Since DAM leased the large tractors from Ryder, they would qualify as "hired 'autos,'" for which coverage would be primary.  Indeed, Stratford's Senior Litigation Specialist, Sandra McFarlane, conceded that the definition of "hired 'autos'" would include the Ryder tractor, but maintained that this was not the parties' intent.  She explained, "I think the problem was that there was an exposure out there that wasn't intended to be covered by the policy."

The district court noted that, "read in isolation, the policy's coverage provision and its definition of 'hired auto' would appear to provide primary coverage for the tractor that Girginoff was driving."  Old Republic, 2014 WL 309390, at *5.  But, the district court found, "[t]he rest of the policy reveals" a contrary intent.  Id.  We agree.

It is a cardinal principle of contract interpretation that we must read the policy "as a whole."  See Great Am. Dining, 62 A.3d at 848.  For this reason, our analysis cannot begin and end with the definition of "hired 'autos.'"  Here, other provisions

---

[2]  We need not dwell on Stratford's argument that the trailer would not be covered even if the tractor was.  "Specifically described 'autos'" are defined as "those 'autos' described in Item Three of the Declarations for which a premium charge is shown (and for Liability Coverage any 'trailers' you don't own while attached to any power unit described in Item Three)."  The definition of "auto" includes trailers.  Item Three includes "any non-owned trailer while attached to a covered auto," with a liability premium of $254.  The trailer is therefore an "'auto' described in Item Three of the Declarations for which a premium charge is shown" so long as the tractor to which it is attached is a covered auto.

within the policy itself reveal a more tailored intent to insure only the smaller side of DAM's business, which conducted small package delivery in small vans and trucks. Highlighting this side of DAM's business, the Stratford Policy describes DAM's business as the delivery of office supplies and small household appliances. There is no mention in the policy of the additional portion of the business concerned with the transportation of palletized freight. DAM listed two of its small vans in the itemization of "specifically described 'autos,'" and provided an estimate for the cost of "hired 'autos'" that is consistent with similar small vans. DAM did not describe the portion of the business concerning palletized freight involving Ryder tractors.

We find the estimated cost of hire for "hired 'autos,'" listed in the Stratford Policy, to be particularly instructive as to the parties' intent. The estimated cost of hire is a term within the four corners of the policy and cannot be ignored. For "hired 'autos,'" DAM estimated the yearly cost of hire to be $5,000. The parties agree that the cost of hire for small vans similar to those DAM owned was $5,000 per year, and that the cost of hire for the Ryder tractors was approximately $240,000 per year. The $5,000 estimate is not binding on the parties, but it is informative of their intent when the policy was created. Although the concurrence posits that an insured might lowball his estimate to reduce his premium, the dramatic $235,000 difference between the

-15-

estimate listed in the contract and the yearly cost to hire the Ryder tractors in this case belies any suggestion that Stratford and DAM intended their policy to provide primary coverage for those tractors.[3]  This incredibly low amount evidences that DAM attempted to insure its own vans as "specifically described 'autos'" and similar hired vans as "hired 'autos,'" and not the Ryder tractors. Further, contract interpretation rules require consideration of the cost estimate within the four corners of the policy as indicative of the intent as to what was being covered.

As in Tech-Built, DAM's lease agreement with Ryder provides objective extrinsic evidence of the intent animating the Stratford Policy as to the scope of coverage.  There, the New Hampshire Supreme Court used an extrinsic lease agreement as a means to obtain clarity as to whom coverage applied. See 898 A.2d at 1010.  Tech-Built made it clear that inconsistent policy language must be viewed in terms of the background, circumstances, and context in which the policy was negotiated. See id. Here, we use a similar extrinsic lease agreement to obtain clarity as to

_____

[3]  In addition, there is no indication that DAM "lowballed" its estimate in the hopes of reducing its premium for an intended coverage.  As noted at oral argument, "[t]here has been no suggestion whatsoever that DAM misrepresented its cost of hire. The question rather was whether, when DAM represented its cost of hire, it was referring to the vans, which is what they say they were referring to, or whether they were referring to something else."  Indeed, when Stratford subsequently learned of the Ryder tractors, it chose not to retroactively increase the premium, but to simply include the tractors in the negotiations for renewal going forward.

-16-

which vehicles coverage applied given the potential inconsistency within the Stratford Policy. DAM and Ryder's lease agreement specified that Ryder was the "party responsible for liability insurance" for the tractors. DAM agreed that "Ryder shall have the sole right to conduct accident investigations and administer claims handling and settlements and [DAM] shall adhere to and accept Ryder's conclusions and decisions."

The district court found that this agreement between DAM and Ryder was "entirely consistent" with the portions of the Stratford Policy that suggest that DAM intended to insure only its small vans through Stratford. See Old Republic, 2014 WL 309390, at *5. "When providing information on the scope of the coverage it needed for hired autos," the district court explained, "DAM knew that Ryder was responsible for liability insurance on the tractors it leased to DAM, and DAM said nothing to Stratford about those tractors." Id. at *6. "In sum, it cannot have been the intent of the parties for Stratford to provide primary coverage on a risk that DAM never sought to insure and that . . . Stratford knew nothing about when it issued DAM its policy and set the premium for it." Id.

Considering the entirety of the Stratford Policy, including the pricing estimate, background, and circumstances, as informed by the lease agreement between DAM and Ryder, we agree with the district court that the Stratford Policy was never

-17-

intended to provide primary insurance for the Ryder tractors. Neither Old Republic nor the concurrence suggests that the policy or the extrinsic evidence supports the proposition that the parties <u>did</u> intend to provide primary coverage for the tractors; rather, they argue that the parties should be restricted to the one provision in the policy defining "hired 'autos'" despite any evidence of a contrary intent. The district court committed no legal error in its analysis of the Stratford Policy and DAM's lease with Ryder. Even viewing the facts in the light most favorable to Old Republic, the record demonstrates that DAM and Stratford did not intend the Stratford Policy to provide primary insurance for the Ryder tractors, which Ryder was already insuring through Old Republic as per its agreement with DAM. <u>See</u> <u>Tech-Built</u>, 898 A.2d at 1010 (finding "no genuine dispute of material fact concerning the clear intent memorialized in the lease agreement"). We repeat what the unanimous court in <u>Tech-Built</u> stated: under New Hampshire insurance law, "where the intent of the contracting parties can be conclusively resolved by objective extrinsic evidence, . . . we will not ignore that evidence in favor of dogmatic adherence to insurance maxims." <u>Id.</u> So too, here.

Because we conclude that Stratford's policy with DAM never provided co-primary coverage for the Ryder tractor, we, unlike the concurrence, need not consider whether New Hampshire law would conclude that Stratford and DAM's later post-loss General

-18-

Change Endorsement is a valid contract modification, which Old Republic disputes. We do note that Stratford has now committed itself to provide excess coverage as to the Ryder tractor both in its endorsement and independently in its representations to the district court and this court.

## IV. Stratford's Duty to Defend

The district court stated that, in New Hampshire, "'the duty of an insurer to defend is the same whether its potential liability is either as a primary or as an excess carrier.'" Old Republic, 2014 WL 309390, at *7 (quoting Universal Underwriters Ins. Co. v. Allstate Ins. Co., 592 A.2d 515, 517 (N.H. 1991)). "[B]ecause Stratford concedes that its policy provides excess coverage," the district court concluded, "it is obligated to share equally in the costs of defending its insureds in the underlying action." Id. Stratford appeals and argues that, as an excess insurer, its duty to defend should be excess to that of the primary insurer.

In 2011, the New Hampshire Supreme Court noted that it "ha[s] never addressed the precise issue of allocation of defense costs between a primary insurer and an excess insurer." Progressive N. Ins. Co. v. Argonaut Ins. Co., 20 A.3d 977, 983 (N.H. 2011). In that case, the court declined to review a trial court's requirement that an excess insurer pay its pro rata share of defense costs since the issue was not properly raised in the

-19-

notice of appeal.  <u>Id.</u> at 980, 983.  The court was also unwilling to hold that the trial court had committed plain error given the unsettled nature of the issue.  <u>Id.</u> at 983.

A previous New Hampshire Supreme Court decision, <u>Universal Underwriters</u>, had touched on the same issue briefly.  In <u>Universal Underwriters</u>, the New Hampshire Supreme Court analyzed the coverage provided by two insurance companies, Universal and Allstate, for a leased vehicle when both purported to be excess carriers.  <u>Universal Underwriters</u>, 592 A.2d at 516.  The court held that Universal provided primary coverage up to $25,000, and that both Universal and Allstate provided co-primary coverage past that amount.  <u>Id.</u> at 517.  On the duty to indemnify, the court held that "the cost of settlement in this case in excess of $25,000 is to be shared pro rata by Universal and Allstate."  <u>Id.</u>  On the duty to defend, however, the court split the total defense costs equally between the two carriers.  <u>Id.</u> at 517-18.  Rejecting the trial court's pro rata division, the New Hampshire Supreme Court stated that "the duty of an insurer to defend is the same whether its potential liability is either as a primary or as an excess carrier."  <u>Id.</u> at 517.

The district court interpreted <u>Universal Underwriters</u> to require primary and excess carriers to equally share the costs of defense.  <u>See</u> <u>Old Republic</u>, 2014 WL 309390, at *7.  The majority rule is that "the excess liability carrier is not obligated to

-20-

participate in the defense until the primary policy limits are exhausted." 14 Couch on Insurance § 200:41 (3d ed. 2014); see also id. § 200:38; Schneider Nat'l Transp. v. Ford Motor Co., 280 F.3d 532, 538 (5th Cir. 2002). The district court's contrary conclusion follows from the statement of the New Hampshire Supreme Court in Universal Underwriters, and the court's holding that the two insurers must split the defense costs equally despite the fact that only Universal provided primary coverage for the first $25,000. See Universal Underwriters, 592 A.2d at 517-18.

Stratford nevertheless argues that Universal Underwriters cannot be taken at its word. Stratford stresses that it is not asking this court to "overrule" the New Hampshire Supreme Court on an issue of New Hampshire state law. Instead, Stratford claims that "[i]t is . . . not at all clear that the Supreme Court of New Hampshire actually held that excess insurers must share defense costs equally with primary insurers" given the context within which Universal Underwriters was decided and the citations on which it relies.

First, Stratford argues that the New Hampshire Supreme Court would have explained its dramatic shift away from the general rule if this was actually its intent. Critically, a federal district court decision interpreting New Hampshire law two years before Universal Underwriters appears to follow the general rule. See Town of Stoddard v. N. Sec. Ins. Co., 718 F. Supp. 1062, 1065-

66 (D.N.H. 1989) (Devine, C.J.). In that case, the district court differentiated between the primary and excess insurer, and held that the primary insurer alone was obligated to reimburse the insured for the costs of the defense. See id. at 1066. Stratford concedes that "[i]t is certainly possible . . . that Universal Underwriters reflects the announcement by the Supreme Court of New Hampshire of a new position on the issue and a repudiation of the approach reflected in Town of Stoddard." But, "[t]here is no indication . . . in Universal Underwriters itself that the court was introducing a new rule of law . . . ."

Second, Stratford argues that the two cases cited by the New Hampshire Supreme Court in Universal Underwriters do not support reading the decision as adopting a new rule. In Universal Underwriters, the court cited a decision from the Georgia Court of Appeals, Zurich Insurance Co. v. New Amsterdam Casualty Co., 160 S.E.2d 603, 605 (Ga. Ct. App. 1968); an earlier decision from the New Hampshire Supreme Court, Liberty Mutual Insurance Co. v. Home Insurance Indemnity Co., 351 A.2d 891, 895 (N.H. 1976); and a treatise, 14 Couch on Insurance § 51:148 (2d ed. 1982). See 592 A.2d at 517.

In Zurich Insurance, the Georgia Court of Appeals stated that one insurer, Zurich, "had a potential liability, either as primary or excess carrier, in either of which cases its duty to

defend was the same." 160 S.E.2d at 605.[4] Zurich had defended the insured and paid the judgment when the other carrier refused. Id. at 604. Ultimately vindicated as the excess carrier, the Georgia Court of Appeals held that Zurich had a duty to defend its insured even though it was excess when the primary refused, but that it had a right to recover from the primary insurer "in the same manner that its insured would have had." Id. at 606. A later case in Georgia cites Zurich Insurance for the uncontroversial position that an excess insurer "ha[s] a duty to defend the claims against its insured after the primary insurer denied coverage and refused to defend." Motors Ins. Co. v. Auto-Owners Ins. Co., 555 S.E.2d 37, 39 (Ga. Ct. App. 2001).

In Liberty Mutual, the New Hampshire Supreme Court held that two insurers provided primary coverage for an accident to varying limits. 351 A.2d at 895. On a motion for rehearing, the court clarified: "As both policies afford primary coverage, Liberty Mutual and Home Insurance have a joint obligation to defend [the insured] and to share equally the costs of defense." Id. The case has no bearing on the respective duties to defend when one insurer is primary and the other excess.

---

[4] Other Georgia cases that held that, "whether an insurer is 'a primary or excess carrier, its obligation to defend is the same under the contract,'" are limited to "cases involv[ing] policies with excess clauses or coverage and defense agreements which are not expressly made excess." Cont'l Cas. Co. v. Synalloy Corp., 667 F. Supp. 1523, 1540 n.9 (S.D. Ga. 1983) (citations omitted).

-23-

The district court's reading of the statement in Universal Underwriters draws the most support from the second edition of Couch's treatise, published in 1982. The cited provision of the treatise explained:

> The duty to defend is absolute, even if the policy turns out to be excess insurance. For example, where a truck driver's car insurer and truck owner's insurer both covered the accident and each policy contained the defense provision, each had the duty to defend the driver against [the] injured party's claim, even if the car insurer's coverage was excess.

14 Couch on Insurance § 51:148 (2d ed. 1982) (collecting cases, including Zurich Insurance). In Hawaii, for example, "[when] both primary and excess insurer[s] shared a duty to defend the action, each insurer was responsible for half of the costs and expenses of defending regardless of the pro rata division of principal liability." Id. (citing Indus. Indem. Co. v. Aetna Cas. & Sur. Co., 465 F.2d 934 (9th Cir. 1972)). Elsewhere in the treatise, however, the general rule is stated as follows: "[w]here the insured maintains both primary and excess policies, . . . an excess liability insurer is not obligated to participate in the defense until the primary policy limits are exhausted." Id. § 51:36.

The modern version of Couch's treatise on insurance law reaffirms that, "[a]s a general rule, a true-excess insurer is not obligated to defend its insured until all primary insurance is exhausted or the primary insurer has tendered its policy limits." 14 Couch on Insurance § 200:38 (3d ed. 2014). "However," the

-24-

treatise continues, "a minority of jurisdictions have held an excess carrier's duty to defend may be triggered if there is a possibility that excess coverage may be reached." Id. The treatise cites Universal Underwriters for the proposition that "[o]nce an excess carrier's obligation to defend arises, the duty to defend is the same as the duty of a primary insurer." Id. This reading of Universal Underwriters is plausible if we assume that the low threshold of $25,000 triggered both carriers' duty to defend and the New Hampshire Supreme Court then required them to split defense costs equally. It is still unclear how this rule, if New Hampshire has adopted this minority position, would apply to the facts of our case when the primary carrier had a coverage limit of $1,000,000 and the complaint does not estimate the damages sought.

The New Hampshire Supreme Court has not provided clarity on its holding in Universal Underwriters regarding an excess insurer's duty to defend since that opinion was issued.[5] When

---

[5] The subsequent citations to Universal Underwriters by the New Hampshire Supreme Court have not focused on this part of the holding. See Peerless Ins. v. Vt. Mut. Ins. Co., 849 A.2d 100, 103 (N.H. 2004) (requiring two insurers to share defense costs equally after finding both excess provisions mutually repugnant); Progressive N. Ins. Co. v. Enter. Rent-A-Car Co. of Bos., Inc., 821 A.2d 991, 993-94 (N.H. 2003) (characterizing the decision as "interpret[ing] [] conflicting provisions in the parties' insurance policies"); Allstate Ins. Co. v. Armstrong, 738 A.2d 1280, 1282 (N.H. 1999) (quoting language concerning parties' attempts to limit the coverage required by New Hampshire's Financial Responsibility Law); Calabraro v. Metro. Prop. & Cas. Ins. Co., 702 A.2d 310, 313 (N.H. 1997) (characterizing the decision as one which "discuss[ed]

denying Stratford's motion to alter or amend its decision, the district court stated that, "if presented with the precise facts of this case, the New Hampshire Supreme Court might be inclined to revisit Universal Underwriters, and reassess that opinion's reliance upon Zurich Insurance . . . ." The district court felt "obligated" to stand by its prior ruling "given the law as currently enunciated by the New Hampshire Supreme Court." On appeal, Stratford invites certification to the New Hampshire Supreme Court, which Old Republic does not oppose.

We are permitted to certify questions of law to the New Hampshire Supreme Court when questions of New Hampshire law are determinative of the case, and there is no controlling precedent from the New Hampshire Supreme Court. N.H. Sup. Ct. R. 34. In Progressive, the New Hampshire Supreme Court explicitly stated that it had never addressed the issue that we now find before us and that it could not say that the state law on the issue is settled. See 20 A.3d at 983. We conclude that certification is the appropriate route in this case given the important, and unsettled, question of New Hampshire law.

We certify the following questions to the New Hampshire Supreme Court:

---

two policies that contained conflicting excess coverage provisions").

1) Under New Hampshire law, when is an excess insurer's duty to defend triggered? Does New Hampshire follow the general rule that the excess insurer's duty to defend is triggered only when the primary insurer's coverage is exhausted? If not, what rule as to allocation of defense costs and timing of payment does New Hampshire follow?

## V. Conclusion

We conclude that DAM and Stratford never intended Stratford to provide co-primary coverage to the tractor-trailer involved in the automobile accident. This leaves Old Republic as the primary insurer, and Stratford as the excess insurer. We certify to the New Hampshire Supreme Court the attendant question of Stratford's duty to defend under New Hampshire law in light of Universal Underwriters.

The clerk of this court is instructed to transmit to the New Hampshire Supreme Court, under the official seal of this court, a copy of the certified questions and our opinion in this case, along with copies of the parties' briefs, appendix, and supplemental filings under Rule 28(j) of the Federal Rules of Appellate Procedure. We retain jurisdiction over this appeal.

So ordered.

**- Concurring Opinion Follows -**

**BARRON, <u>Circuit Judge</u>, concurring in part and concurring in the judgment.** I fully join the decision to certify the duty-to-defend question to the New Hampshire Supreme Court. I do not agree, however, that the Stratford policy, as originally issued, provided no coverage for the Ryder tractor. In my view, the original policy did provide such coverage, but the retroactive endorsement then made such coverage excess instead of primary. And thus I end up where the majority does, but by a different route.

As the majority notes, Stratford's Senior Litigation Specialist, on reviewing the language of Stratford's policy, concluded "there was an exposure out there that wasn't intended to be covered by the policy." Maj. Op. at 14. But Stratford's response was not to argue the parties' intent trumped the policy's text nor to suggest the text was less than clear. Instead, Stratford reached an agreement with its insured to change the policy's text via a retroactive endorsement that expressly limited that otherwise concerning exposure.

Thus, it is not surprising that in the District Court, even Stratford -- following its Senior Litigation Specialist's lead -- did not dispute that the original policy covered the Ryder tractor. Of course, now that the District Court has bypassed the parties' arguments about how best to deal with the exposure and, of its own accord, ruled such exposure never existed, Stratford

-28-

agrees. But I believe Stratford had it right the first time. It did provide such coverage, even if it did so due to poor drafting.

No matter, though. Stratford worked out a deal. That deal limited the exposure by making coverage of tractors hired from Ryder excess rather than primary. And thus, the parties to the Stratford policy reached a sensible and practicable result. I think we should bless it rather than read the policy in a way that, I worry, may suggest to some that insureds should have less confidence in the text of their policies than I read precedent to show they should.

## I.

The majority accepts, as it must, that the most directly pertinent portion of the policy -- the definition of "hired 'auto'" -- indisputably includes the Ryder tractors. Maj. Op. at 13-14. That definition includes any "land motor vehicle, 'trailer,' or semitrailer designed for travel on public roads" that DAM "lease[s], hire[s], rent[s], or borrow[s]" from third parties. And the policy then states that it broadly covers "all sums an 'insured' legally must pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies, caused by an 'accident' and resulting from the ownership, maintenance or use of a covered 'auto'" -- including, for this policy, a "hired 'auto.'" The language could not be clearer.

Nonetheless, I can understand the temptation to look beyond the policy's plain text. It does seem, from what the law calls extrinsic evidence (which is to say, evidence not found within the language of the policy itself), that neither party thought, at the time of drafting, about the kind of tractor at issue in this case. Stratford apparently did not know about this part of the insured's business, and the insured apparently did not think Stratford was the source of coverage for these tractors.

But the majority acknowledges -- as it must -- that extrinsic evidence becomes relevant to limit exposure only if the text is actually ambiguous. White v. Vt. Mut. Ins. Co., -- A.3d -- , 2014 WL 6533298, at *3 (N.H. 2014) ("[A]bsent ambiguity, our search for the parties' intent is limited to the words of the policy." (quoting Bates v. Phoenix Mut. Fire Ins. Co., 943 A.2d 750, 753 (N.H. 2008))). And that rule reflects the fact that while the intent of the parties controls, that intent is found first and foremost in the words of the policy -- words that, when clear, are determinative. See id. I do not read the majority's key case, Tech-Built, to say otherwise. See Tech-Built 153, Inc. v. Va. Sur. Co., 898 A.2d 1007 (N.H. 2006). There, the court first found the text of the policy at issue ambiguous and only then turned to extrinsic evidence to limit the reach of the coverage. Id. at 1009-10.

Nor does <u>Tech-Built</u>, as I read it, support finding ambiguity here. In that case, Tech-Built, a construction company, was a client of an employee leasing company called Surge. <u>Id.</u> at 1008. Tech-Built claimed the insurance policy that covered Surge actually also covered Surge's clients. <u>Id.</u> at 1009. Tech-Built based that surprising contention on the following policy language: Surge's policy listed the "insured" as Surge "etal [sic]." <u>Id.</u> (alteration in original). The policy then listed both Surge's address and its "other workplaces," which Surge described by listing the various companies (Tech-Built included among them) to which it had leased employees. <u>Id.</u> From this thin textual basis -- an "interplay," the court charitably called it -- Tech-Built claimed Surge's carrier had plainly agreed to supply insurance coverage to 150 or so of Surge's clients, <u>id.</u>, a most implausible claim. The New Hampshire Supreme Court had no trouble rejecting it. It simply noted that "[o]ther language" in the policy would be rendered "nonsensical" if Tech-Built's interpretation was right. <u>Id.</u> at 1009-10.

That case is thus very far from this one. The definition of "hired 'auto,'" unlike the definition of "insured" in <u>Tech-Built</u>, is crystal clear. And while the majority is quite right that the policy text must be considered as a whole, giving this "hired 'auto'" language its plain meaning does not make nonsense of other parts of the policy. In fact, a plain reading of "hired

-31-

'autos'" does not even lead to an "internally inconsistent policy." Maj. Op. at 11 (citing Tech-Built, 898 A.2d at 1010). A review of the three other aspects of the policy the majority relies on in finding ambiguity reveals why.

First, the majority notes the policy describes DAM's business as consisting of the delivery of office supplies and appliances, and makes no reference to any business involving the transport of "palletized freight." Maj. Op. at 15. If the majority's point is that the description of DAM's business is not consistent with a policy term that plainly covers leased tractors, I cannot agree. After all, such tractors could readily be used to deliver office supplies and appliances.

More fundamentally, Stratford's policy does not contain explicit language tying coverage to the description of DAM's business. And the general rule (which, so far as I can tell, New Hampshire does not reject) is that "business descriptions" do not limit coverage to the precise type of business described. See, e.g., Mount Vernon Fire Ins. Co. v. Belize NY, Inc., 277 F.3d 232, 239 (2d Cir. 2002) (rejecting the argument that a policy's description of the insured's business as "Carpentry" served to limit the coverage "to carpentry operations," because "[t]he Policy simply fails to provide that the classifications define the covered risks"); GRE Ins. Grp. v. Metro. Bos. Hous. P'ship, 61 F.3d 79, 82 (1st Cir. 1995) (rejecting the argument that a "business

-32-

description" of "office" meant "only liability arising from [the insured]'s office operations was covered" because while the fact that the type of business was "office" rather than "skating rink" was "obviously relevant to coverage," the description "d[id] not show a clear understanding to restrict coverage to liability arising out of [insured]'s office only").

That rule makes sense. An insurer may require the description to inform the premium the insurer sets. But if the insurer wants to strictly limit coverage to activities within that description, it should explicitly say so. Mount Vernon Fire Ins., 277 F.3d at 239; see also, e.g., Wickramasekra v. Associated Int'l Ins. Co., 890 So.2d 569, 574 (La. Ct. App. 2003) (construing a policy with an endorsement that explicitly restricted coverage to the type of business shown on the declaration); Sun Indem. Co. v. Lovell, 6 Conn. Supp. 337 (Conn. C.P. 1938) (same).

Second, the majority notes the policy covers "specifically described 'autos'" and that the two "specifically described 'autos'" listed in the policy are smaller vans and not Ryder tractors. Maj. Op. at 15. But the policy provided coverage for two separate categories of "autos": "hired 'autos'" that, by terms, DAM does not own, and "specifically described 'autos'" that, by terms, must be described on a separate schedule. That schedule in turn refers to the listed vehicles as "covered autos you own." The leased Ryder tractors, therefore, were not listed as

-33-

"specifically described 'autos'" for the simple reason that DAM did not own them. As vehicles DAM only leased, these tractors would be covered as "hired 'autos.'" If the majority's point is that an objective reader would have to assume that the rented vehicles necessarily would be similar in type to the owned vehicles specially listed on the schedule, I do not see why. Companies might rent vehicles of a different type precisely <u>because</u> the ones they own are not adequate to every task.

Finally, the majority notes the policy lists an "estimated cost of hire" for all hired autos at $5,000 per year. Maj. Op. at 15. That number is small. It does seem fit for a modest business using vans rather than for a large one using tractors. But the text of the policy contemplates insureds may lowball their estimates -- presumably to reduce their premiums. That is why -- as the majority acknowledges, Maj. Op. at 15 -- the policy expressly provides that estimates supplied by the insured on this portion of the policy are not binding. In fact, the policy further provides that Stratford may audit the insured's actual hired-auto expenditures and retroactively increase the premium should the estimate prove too low. In other words, even though no intentional low-balling occurred here, Stratford's policy made clear that an insured's low estimate is not binding in the insured's favor. I thus do not believe we should rely on the

estimate to create an ambiguity in what is otherwise clear and plainly binding policy language -- the "hired 'auto'" definition.

For these reasons, I would hold the policy language is clear. That being the case, it seems to me that New Hampshire law requires us to give effect to the plain meaning of the "hired 'autos'" definition. White, 2014 WL 6533298, at *3; Bates, 943 A.2d at 753. And thus we may not limit the coverage by looking about for outside evidence of the parties' understandings (here, the contract between DAM and Ryder). But that does not mean Stratford is without recourse, as I will now explain.

**II.**

Faced with an exposure it wished to limit, Stratford reached out to DAM to provide excess coverage, rather than primary coverage, for the leased Ryder tractors. I would give the deal Stratford and DAM struck full effect.

True, as Old Republic points out, a party's affirmation of a preexisting duty is not generally adequate consideration for a new contract. Melotte v. Tucci, 66 N.E.2d 357, 358 (Mass. 1946). But relinquishing a contestable claim is. Pitkin v. Noyes, 48 N.H. 294, 304 (1869); see also Mathewson Corp. v. Allied Marine Indus., Inc., 827 F.2d 850, 856 (1st Cir. 1987) (Massachusetts law). I conclude Stratford's pre-existing duty to provide coverage was clear. But I do not believe a contrary claim would be frivolous. And, of course, neither would the majority. Thus, Stratford gave

up something real. It foreclosed its right to argue it could deny coverage altogether. See Chisholm v. Ultima Nashua Indus. Corp., 834 A.2d 221, 225 (N.H. 2003) ("Consideration is present if there is either a benefit to the promisor or a detriment to the promisee."); see also Pitkin, 48 N.H. at 304 ("[C]ompromise of doubtful claims" is consideration unless the claims are "utterly without foundation and known to be so"); Mathewson Corp., 827 F.2d at 856 (finding consideration if the surrendered claim is not "'vexatious or frivolous'" (quoting Blount v. Dillaway, 85 N.E. 477, 479 (Mass. 1908)).

Old Republic also argues the endorsement prejudiced Old Republic without Old Republic's consent. But no term in the Stratford policy protected Old Republic from such modification. See Restatement (Second) of Contracts § 311(2) (absent a term in the contract forbidding modification of a duty to a third party "the promisor and promisee retain power to discharge or modify the duty by subsequent agreement"); see also Brooks v. Trs. of Dartmouth Coll., 20 A.3d 890, 900 (N.H. 2011) (following the Second Restatement's description of third-party beneficiary rules -- though not mentioning this particular one -- as a matter of New Hampshire law).

Nor does New Hampshire law make Old Republic a vested third-party beneficiary entitled to such protection in the absence of such a policy term. The original Stratford policy did not

"satisfy some obligation owed by the promisee [DAM] to the third party [Old Republic]," nor was that policy "so expressed as to give the promisor [Stratford] reason to know that a benefit to a third party [Old Republic] is contemplated by the promisee [DAM] as one of the motivating causes of his making the contract." Brooks, 20 A.3d at 900. In fact, Stratford did not have reason to know about the Old Republic policy, much less to know DAM contemplated Old Republic would benefit from the Stratford policy.

That leaves only Old Republic's argument that the endorsement violates a public policy against "post-claim underwriting." The out-of-New Hampshire cases on which Old Republic exclusively relies (from Louisiana and Mississippi, respectively) are readily distinguished. They involved retroactive policy alterations that limited the coverage for an injured party (in two instances, for an injured party who was also a party to the policy). See Mattox v. W. Fid. Ins. Co., 694 F. Supp. 210, 216 (N.D. Miss. 1988); Washington v. Savoie, 634 So. 2d 1176, 1180 (La. 1994); Lewis v. Equity Nat'l Life Ins. Co., 637 So. 2d 183, 188-89 (Miss. 1994). And those alterations were made without the insurer first obtaining the injured party's consent. See Mattox, 694 F. Supp. at 216; Washington, 634 So. 2d at 1180; Lewis, 637 So. 2d at 188-89.

Nothing like that happened in this case. Here, the insured consented to the change at the time it was made. And,

further, the party injured by the insured will not suffer any reduction in total coverage in consequence of the change. Thus, the only party "harmed" by this change is an insurer, Old Republic, who is not a party to the policy changed and whose harm is hard to divine. Old Republic simply must provide coverage it thought it was on the hook for all along -- coverage Old Republic also must provide under the majority's approach.

## III.

An insured should be able to rely on what the policy says. New Hampshire agrees. Like other states, it provides that even ambiguous policies "will be construed against the insurer," Catholic Med. Ctr. v. Exec. Risk Indemn., Inc., 867 A.2d 453, 456 (N.H. 2005), at least absent sufficient extrinsic evidence to show the parties intended otherwise. All the more reason, therefore, to be wary of resorting to extrinsic evidence too easily and then relying on it to defeat coverage for the insured. As this case and others I refer to show, the non-binding aspects of a policy may not reflect the full extent of the coverage contained in a policy's binding passages. But it is those binding passages that should control when clear. And as I find them clear here, I also find them controlling.