# United States Court of Appeals
## For the First Circuit

No. 14-1316

FRANCISCO ABRIL-RIVERA, ET AL.,

Plaintiffs, Appellants,

and

MADELINE AGUAYO, ET AL.,

Plaintiffs,

v.

JEH JOHNSON, Secretary of the Department of Homeland Security;
UNITED STATES DEPARTMENT OF HOMELAND SECURITY; FEDERAL EMERGENCY
MANAGEMENT AGENCY,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]

Before

Torruella, Lynch, and Thompson,
Circuit Judges.

Adriana G. Sánchez-Parés, with whom Álvaro R. Calderón, Jr.,
Francisco J. Ortiz-García, and Álvaro R. Calderón, Jr. L.L.P. Law
Office were on brief, for appellants.

Adam C. Jed, Appellate Staff Attorney, with whom Joyce R. Branda, Acting Assistant Attorney General, Rosa E. Rodriguez-Velez, United States Attorney, and Marleigh D. Dover, Appellate Staff Attorney, were on brief, for appellees.

———————————————————

July 30, 2015

———————————————————

**LYNCH, Circuit Judge**.  The Federal Emergency Management Agency (FEMA) is an agency within the Department of Homeland Security (DHS) tasked with assisting "State and local governments in carrying out their responsibilities to alleviate the suffering and damage that result from major disasters and emergencies by," among other things, "[p]roviding Federal assistance programs for public and private losses and needs sustained in disasters."  44 C.F.R. § 206.3; see also 42 U.S.C. § 5174(a)(1); Exec. Order No. 12673, 54 Fed. Reg. 12,571 (Mar. 23, 1989).  Pursuant to this mission, FEMA has established call centers, which primarily receive calls from those affected by disasters, and National Processing Service Centers (NPSCs), which both receive calls and process claims.

Plaintiffs were employees of the now-closed Puerto Rico NPSC (PR-NPSC) run by FEMA.  They filed this Title VII lawsuit alleging that FEMA's actions in implementing a rotational staffing plan at the PR-NPSC and in eventually closing the facility discriminated against them on the basis of their Puerto Rican national origin and constituted unlawful retaliation for protected conduct.  The district court granted summary judgment to defendants, finding that defendants had legitimate, nondiscriminatory reasons for their actions and, with respect to the rotational staffing plan retaliation claim, that plaintiffs

- 3 -

had not shown a causal link between their protected conduct and the purported retaliation.

We affirm the dismissal of the case. We hold that plaintiffs' disparate impact claims fail for two reasons. First, under our caselaw, claims of different treatment based on location absent a claim of intentional discrimination do not establish liability under 42 U.S.C. § 2000e-2(h). Plaintiffs here have expressly disavowed any claim of intentional discrimination. Second, the challenged actions were job-related and consistent with business necessity, and plaintiffs have not shown that there were alternatives available to FEMA that would have had less disparate impact and served FEMA's legitimate needs. Both retaliation claims fail because plaintiffs have not shown that the allegedly adverse employment actions were causally related to any protected conduct.

## I. Background

We recite the facts in the light most favorable to plaintiffs. See Ramírez-Lluveras v. Rivera-Merced, 759 F.3d 10, 13 (1st Cir. 2014). In 1995, FEMA established a "temporary call center" in San Juan, Puerto Rico to address calls from Spanish-speaking victims of Hurricane Marilyn. The call center was located in a vacant manufacturing plant in Puerto Rico under a disaster lease and was originally designed to be only a temporary facility. Because the center "was never intended . . . to serve as a long-

term NPSC operation," it "did not have many of the amenities that the agency would normally seek when establishing a long-term, fixed site facility."

In 1998, the center began processing claims as well as receiving calls, and in 2003 it became the fourth full-fledged NPSC (the three others are in Maryland, Texas, and Virginia). The PR-NPSC was the only fully bilingual NPSC. FEMA made some limited improvements to the Puerto Rico facility when it became a NPSC, but it still lacked the "state of the art furniture and equipment" found in the other NPSCs.

In 2006, several groups of PR-NPSC employees complained to management that they were being paid less than their mainland counterparts. When no resolution was reached in their cases, plaintiffs filed with the Equal Employment Opportunity (EEO) Office an informal complaint of discrimination in October 2006 and a formal complaint of discrimination in April 2007. In May 2007, an employee filed with the EEO a class complaint on behalf of one group of employees. The class complaint was dismissed in 2008.[1]

In June 2007, FEMA's Occupational, Safety & Health Office conducted a Management Evaluation and Technical Assistance

_____

[1] Plaintiffs state that the FEMA administrative judge overseeing the class complaint ordered certain plaintiffs "to individually re-file their [pay] claims, which they did later on." However, plaintiffs point to no evidence that the plaintiffs did in fact re-file any claims after May 2007.

Review (METAR) of the PR-NPSC facility.[2] The METAR disclosed several "serious deficiencies," including, for example, a lack of exit signs at several locations in the facility and the absence of "[i]nitial safety orientation training." Several of the deficiencies were rated as "[s]ignificant risk[s] to health and safety" for which "abatement measures should be initiated within 30 days." The management of the Puerto Rico center responded with a memorandum acknowledging receipt of the report and explaining the steps that the PR-NPSC had taken and would take to begin to rectify the deficiencies. By May 2008, management represented that it had addressed the major issues identified on the METAR save one: the construction of an egress route around the building.[3] Management was still concerned about the physical facility and particularly fire hazards.

---

[2] 29 C.F.R. § 1960.25(c) requires annual inspections of federal workplaces "to ensure the identification and abatement of hazardous conditions." The PR-NPSC had not been inspected on an annual basis between 2003 and 2007, and the record contains no explanation for this failure. There is no claim, however, that the other NPSCs have not been similarly inspected. Indeed, the Maryland NPSC was inspected in May 2008, the Virginia NPSC in June 2008, and the Texas NPSC in April 2009.

[3] PR-NPSC management contacted the center's landlord regarding construction of an egress route around the facility, but the landlord responded that the building met "the minimum requirements under the [Americans With Disabilities Act] and [the landlord was] therefore not required to make these improvements." PR-NPSC management stated in its response to the METAR that they would "request authorization and funds for this project, since it continue[d] to pose a safety issue."

PR-NPSC management arranged for a more specific Fire Protection and Life Safety Code review of the facility in May 2008. This review was arranged to address fire safety issues identified in the 2007 METAR in advance of the expiration of the facility's lease in September 2008. That inspector found several problems and produced an extensive "List of Safety & Health Items to be Completed for Facility to Become Fully Acceptable." To name just a few examples, the building did not have an automatic fire sprinkler, working fire alarms, or a sufficient number of exits. The inspector also noted that the roof of the facility could not withstand a Category 3 storm.

On May 16, 2008, Kathy Fields, the Branch Chief for NPSC Operations, notified the employees of the PR-NPSC that, "[b]ecause the safety and security of our employees is our top priority, it is necessary to suspend operations at the PR NPSC until the identified fire and life safety deficiencies are corrected." FEMA placed its employees on administrative leave and continued paying them until July 18, 2008. The facility was not occupied from May 16, 2008, to mid-July 2008. It later resumed operations, with a limited staff.

In light of these ongoing concerns, FEMA "determined that the cost of repairing and/or relocating the facility necessitated a critical review." Fields began considering the

option of closing the PR-NPSC upon expiration of the lease.  As explained in a May 19, 2008, e-mail:

> [Fields'] main rationale for closure is that the Agency no longer requires the large Spanish-language capacity it is carrying at the NPSC's.  Also, the overall need for personnel at the NPSC's has lessened. Further, to the extent Spanish-language NPSC employees are needed, this can probably be accommodated at the other NPSC's in Texas, Maryland and Virginia.  Lastly, the lease for the Puerto Rico NPSC is about to expire -- so that's why she's thinking through these issues now. . . .
> The last big Puerto Rico disaster requiring a large capacity of Spanish-language employees in the NPSC's was Hurricane Georges in 1998.
> Since that time the need for Spanish-language personnel at the NPSC's has been steadily declining.  Essentially, the Agency has been carrying a large Spanish-language capacity at the NPSC's for some time at a level that's greater than needed.

Fields circulated a report outlining her recommendations and her reasoning to several senior FEMA officials on May 23, 2008, as to short-term and longer-term options.[4]  The report explained that the immediate repairs necessary to temporarily reoccupy the building until the end of the lease would cost $75,000, while the longer-term repairs necessary to permanently reoccupy the building would cost $525,000.  These estimates did not include the cost of a new roof, which the report noted was also needed.

---

[4]     The final decision on whether to close the center rested with the DHS Secretary, but it was the responsibility of senior FEMA officials to brief the Secretary on the issue.

However, the lease on the facility would expire at the end of September 2008, unless temporarily extended. As it was, FEMA occupied the facility until February 2009. A new facility would have cost FEMA nearly $9 million up front and would have had an annual operating cost of approximately $19 million. The report concluded that, because the remainder of the NPSC system had the capacity to absorb the PR-NPSC's workload, these potential expenses were not justified, and it was preferable to simply let the facility's lease expire and not build a new facility. The report also included a list of options for addressing the PR-NPSC's deficiencies that had been considered and rejected.

David Garratt, FEMA's Deputy Assistant Administrator, the principal recipient of the report, responded to Fields that he "agree[d] with the recommendation and supporting logic." He stated that he would forward the report to FEMA's Deputy Administrator.

On July 15, 2008, Fields sent a memorandum to all PR-NPSC employees explaining that, based on FEMA's review of the inspection results, FEMA had decided in the short term "to continue making repairs to the facility and," while that was done, "to resume operations with a reduced staff sufficient to ensure readiness in the event disaster activity warrants increased staffing levels." The memorandum announced a new staffing plan, which involved having approximately 15-20 employees (out of a total of around 300) work at a time, on a rotational basis. This

rotational staffing plan, Fields explained, was "expected to continue through the end of calendar year 2008; a decision on the longer-term future of the PR-NPSC ha[d] not yet been made." FEMA placed PR-NPSC employees who were not working on "non-duty, non-pay status effective July 19, 2008," but volunteered to "make every effort to assist" employees who wished to transfer to one of the other NPSCs.[5]

FEMA completed "[c]ritical repairs" to keep the PR-NPSC open in October 2008, which allowed the center to operate at an "expanded, but still limited capacity," "subject to continued implementation of [certain] life safety measures."[6] By this time, the FEMA Administrator had decided to close the PR-NPSC permanently, and so recommended to DHS. The DHS Secretary agreed

---

[5]  In the months following the implementation of the rotational staffing plan, several PR-NPSC employees filed EEO complaints regarding that plan, alleging that FEMA was discriminating against them on the basis of national origin. Plaintiffs assert that these complaints were filed between July 2008 and December 2008, while defendants' brief refers only to "August 2008 EEO complaints." However, neither plaintiffs nor defendants provide a record citation to support their claim about the timing of the complaints. Based on the record, it is not clear when the first complaints were filed, but an October 8, 2008, e-mail from Kathy Fields demonstrates that over 300 complaints about the rotational staffing plan had been filed by that date. The PR-NPSC EEO specialist sent a list of questions regarding the employees' complaints to the management of the PR-NPSC in October 2008. The parties' briefs do not say whether any of these complaints were resolved prior to the filing of this lawsuit.

[6]  The record does not reflect the terms under which FEMA continued to occupy the building after the expiration of the lease in September 2008.

on December 10, 2008, and the closure and the elimination of all positions at the PR-NPSC were announced, including to PR-NPSC employees, on December 30, 2008. In an e-mail the next day, the FEMA Administrator explained:

> [W]e carefully considered all available options before making the decision to close the Puerto Rico NPSC. It was determined that this facility, originally established only to serve a temporary mission, no longer has an operational requirement. Additionally, and in view of the inadequacy of the existing facility, FEMA determined that it would not be a sound investment to repair or relocate the Puerto Rico NPSC to a new facility.

The Administrator reiterated Fields' statement that FEMA would assist PR-NPSC employees in seeking another position within FEMA. Some PR-NPSC employees did in fact transfer to a different NPSC facility.

Another memorandum from Fields to PR-NPSC employees, dated December 30, 2008, explained the reasons for the facility's closure in more detail. First, NPSC call volume had decreased since 2004 in light of the availability of Internet self-service options. Second, Spanish-language calls in particular had become an almost negligible portion of the NPSC workload. Third, the PR-NPSC facility was "not suitable to serve as a long-term NPSC operation" because it "was never outfitted with modern systems furniture and the supporting electrical infrastructure and some of the critical telecommunications equipment needed to support future

- 11 -

technology upgrades." In sum, "[t]he estimated relocation and annual operational expenses associated with a new facility [were] not justified based on historical and anticipated NPSC workload."

## II. Procedural History

Plaintiffs filed this lawsuit in October 2009, alleging that defendants engaged in discrimination on the basis of national origin and retaliation in violation of Title VII. The district court granted summary judgment to defendants on all of plaintiffs' claims, finding, essentially, that each of defendants' challenged actions were undertaken for non-discriminatory, valid business reasons and therefore were not unlawful under Title VII.

On appeal, plaintiffs press only their disparate impact and retaliation claims arising from two actions on the part of defendants: (a) the implementation of the rotational staffing plan during the fire-safety related work at the facility which reduced the number of days of work for each employee, and (b) the closure of the PR-NPSC. We review the district court's grant of summary judgment under Federal Rule of Civil Procedure 56 de novo, and affirm "only if the record discloses no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Old Republic Ins. Co. v. Stratford Ins. Co., 777 F.3d 74, 79 (1st Cir. 2015) (quoting Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London, 637 F.3d 53, 56 (1st Cir. 2011)) (internal quotation marks omitted). We "read[] the

facts and draw[] all inferences in the light most favorable to the plaintiffs." Ramírez-Lluveras v. Rivera-Merced, 759 F.3d 10, 19 (1st Cir. 2014).

### III. Analysis

A.      Disparate Impact as to Rotational Staffing Plan and as to Closing

"Title VII prohibits both intentional discrimination (known as 'disparate treatment') as well as, in some cases, practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities (known as 'disparate impact')." Ricci v. DeStefano, 557 U.S. 557, 577 (2009). As far as we can tell, plaintiffs have not provided record evidence showing that they are actually of Puerto Rican ancestry and origin, such as to meet the definition of members of a protected minority group under Title VII. See 29 C.F.R. § 1606.1 (defining "national origin discrimination" as including "denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group"). That the plaintiffs simply worked for FEMA in Puerto Rico -- without evidence of their membership in a protected class -- would not suffice for a national origin-based disparate impact claim. See Vitalis v. Sun Constructors, Inc., 481 F. App'x 718, 721 (3d Cir. 2012) (noting that "'locals' or 'local Virgin

- 13 -

Islanders'" did not constitute a protected group based on national origin because "[n]o evidence demonstrated that all of the local residents of St. Croix share a 'unique historical, political, and/or social circumstance[]'" (second alteration in original)). For purposes of our analysis, however, we can assume without deciding that plaintiffs have satisfied this threshold element, as their claim fails on other grounds. Cf. Candelario Ramos v. Baxter Healthcare Corp. of P.R., 360 F.3d 53, 56 (1st Cir. 2004) (proceeding on this assumption).

Plaintiffs have not pursued an intentional discrimination theory on appeal, and have expressly disavowed it. Their claim is that the discrimination was against the Puerto Rican facility in which they worked, which caused a disparate impact on the basis of national origin.

A plaintiff proceeding under a disparate impact theory "establishes a prima facie violation by showing that an employer uses 'a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin.'" Ricci, 557 U.S. at 578 (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(i)). If the plaintiff makes out a prima facie case, the employer "may defend against liability by demonstrating that the practice is 'job related for the position in question and consistent with business necessity.'" Id. (quoting 42 U.S.C. § 2000e-2(k)(1)(A)(i)). And if the employer makes that showing,

the plaintiff may rebut it by demonstrating "that the employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs." Id. (citing §§ 2000e-2(k)(1)(A)(ii) and (C)).[7]

We reject the disparate impact claim for two reasons. Defendants have established there is a legitimate business justification for the decision. And under our case law there is a logically prior disqualification of plaintiffs from making this claim. We deal first with the logically prior question.

A different provision of Title VII definitively resolves this claim in favor of the defendants at the outset. 42 U.S.C. § 2000e-2(h) provides that

> [n]otwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment . . . to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin . . . .

---

[7] The district court held that plaintiffs had successfully made a prima facie case of disparate impact discrimination with respect to both the rotational staffing plan and the closing of the PR-NPSC facility, but that defendants' actions were consistent with business necessity and that plaintiffs had not presented viable less discriminatory alternatives.

"In other words, different treatment in different locations is permissible absent an intent to discriminate." Candelario Ramos, 360 F.3d at 61.

That safe harbor statutory provision in § 2000e-2(h) defeats both of plaintiffs' disparate impact claims, as to the Puerto Rico employees being rotated while the facility was repaired and as to the closing of the facility after the lease expired.[8] As we said in Candelario Ramos, "[t]he subsection itself is not surprising. Location is often a proxy for differences in cost and other competitive circumstances . . . ." Id. at 62. Congress acted rationally in treating this as a situation of no liability, rather than as a defense. See id.

The dissent contends that the safe harbor provision does not apply to this case because the plaintiffs' positions were

---

[8] Plaintiffs' opening brief refers to a third allegedly discriminatory employment practice -- the fact that there were no full-time positions at the PR-NPSC. But the brief mentions this only in passing, under a heading entitled "PR-NPSC Closure," and that is not enough to preserve the argument. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). Moreover, at oral argument, the court asked plaintiffs' counsel to specifically enumerate the challenged employment practices, and she listed only the implementation of the rotational staffing plan and the closing of the PR-NPSC, thus confirming that the plaintiffs are not pursuing an argument based on full-time positions on appeal. In any event, such an argument would fail in light of the safe harbor. It would also fail because, as the district court found, plaintiffs presented no record evidence of any deleterious consequences they suffered as a result of their employment classification.

eliminated.  But our decision in Candelario Ramos described § 2000e-2(h)'s application in expansive terms, making no mention of a subject-matter limitation.  See 360 F.3d at 62; see also Russell v. Am. Tobacco Co., 528 F.2d 357, 362 (4th Cir. 1975) (stating that the safe harbor would apply to decisions concerning promotions).

It is true that defendants did not raise the safe harbor provision in the trial court or explicitly argue it on appeal.[9] But "it is settled in this circuit that 'an appellate court has discretion, in an exceptional case, to reach virgin issues.'" Chestnut v. City of Lowell, 305 F.3d 18, 21 (1st Cir. 2002) (en banc) (quoting United States v. La Guardia, 902 F.2d 1010, 1013 (1st Cir. 1990)); see also Nat'l Ass'n of Social Workers v. Harwood, 69 F.3d 622, 627 (1st Cir. 1995) (noting that the "raise-or-waive principle, though important, is a matter of discretion"); cf. Batista v. Cooperativa De Vivienda Jardines De San Ignacio, 776 F.3d 38, 42 (1st Cir. 2015) (noting that "we may affirm the entry of summary judgment on any ground made manifest by the record, so long as the record reveals that there is no genuine

---

[9]     Because we find that our consideration of the safe harbor provision is appropriate in any event, we need not address whether the safe harbor is an affirmative defense or simply a congressional explanation about the substantive reach of Title VII.  Cf. Candelario Ramos, 360 F.3d at 62; see generally 5 Wright & Miller, Federal Practice & Procedure § 1271 (3d ed.) (discussing the difference between affirmative defenses and defenses that need not be affirmatively pleaded under Rule 8).

issue as to any material fact and that the moving party is entitled to judgment as a matter of law" (citations omitted)). We conclude that this case is appropriate for the exercise of that discretion.

As our dissenting colleague agreed in his concurrence in Chestnut, the following factors inform our discretion: (1) whether the issue is purely legal, (2) whether the issue is of constitutional magnitude, (3) whether the "omitted argument [is] highly persuasive," (4) whether consideration of the argument would prejudice the plaintiff, (5) whether the omission was inadvertent, and (6) whether the issue "implicated a matter of great public concern." 305 F.3d at 24 (Torruella, J., concurring); see also United States v. Krynicki, 689 F.2d 289, 291-92 (1st Cir. 1982).

At least four of those factors weigh in favor of our considering the safe harbor issue. First, the issue is purely legal and can be resolved on the existing record. Second, the argument that it applies is highly persuasive. Third, our consideration of the issue does not prejudice plaintiffs. Even if the safe harbor did not apply, plaintiffs' claims would still fail because, as we explain below, defendants have set forth legitimate business justifications for their challenged actions. Finally, the issue involves important questions about the reach of Title VII that may arise in future cases. Cf. Chestnut, 305 F.3d at 24-25 (Torruella, J., concurring) (agreeing with majority's decision

- 18 -

to address an issue for the first time on appeal after a balancing of the foregoing factors).

As an independent holding, even if the safe harbor provision were not applicable, we would still affirm the district court's dismissal of plaintiffs' disparate impact claims as baseless. That is because, regardless of whether plaintiffs have made out a prima facie case of impact, defendants have presented legitimate business justifications for their actions, and there is no contrary evidence. The recent Supreme Court decision in Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc., 135 S. Ct. 2507 (2015), establishes this is so. There, the Court emphasized that "disparate impact liability must be limited so employers and other regulated entities are able to make the practical business choices and profit-related decisions that sustain a vibrant and dynamic free-enterprise system." Id. at 2518. It must also be limited as applied to government entities so as to avoid "inject[ing] racial considerations into every [agency] decision." See id. at 2524. "Governmental or private policies are not contrary to the disparate-impact requirement unless they are artificial, arbitrary, and unnecessary barriers." Id. (citation omitted).

Accordingly, "before rejecting a business justification . . . a court must determine that a plaintiff has shown that there is 'an available alternative . . . practice that has less disparate

impact and serves the [entity's] legitimate needs.'" Id. at 2518 (second and third alteration in original) (quoting Ricci, 557 U.S. at 578). If employers' business "judgments are subject to challenge without adequate safeguards, then there is a danger that potential defendants may adopt racial quotas -- a circumstance that . . . raises serious constitutional concerns." Id. at 2523; see also id. ("Without adequate safeguards at the prima facie stage, disparate-impact liability might cause race to be used and considered in a pervasive way and would almost inexorably lead governmental or private entities to use numerical quotas, and serious constitutional questions then could arise."). "[P]rompt resolution of these cases is important." Id.

With regard to the rotational staffing plan, we agree with the district court that "the rotational staffing plan served FEMA's legitimate needs of maintaining as many employees as possible to assist in the event of a disaster" while still maintaining a safe working environment. Plaintiffs contend that the FEMA employees could have continued working in the center while the safety issues were addressed, but their disagreement does not create a triable issue that FEMA's position resulted from Puerto Rican national origin discrimination. "[G]overnmental entities . . . must not be prevented from achieving legitimate objectives, such as ensuring compliance with health and safety codes." Id. at 2524. The record is clear that the 2008 inspection revealed

serious safety concerns, and FEMA's decision to reduce staffing levels while addressing those concerns and evaluating the future of the PR-NPSC was reasonable. Even plaintiffs' counsel conceded that these concerns should not have been ignored. Indeed, once FEMA became aware of the problems at the PR-NPSC, it had no choice but to address them; FEMA would have been subject to an entirely different sort of legal liability had it failed to do so. And Title VII did not require FEMA to re-staff the center the minute that the majority of the safety concerns were resolved, particularly given that defendants had begun contemplating the closing of the center by that time.

Regarding the closing of the center, the undisputed facts show numerous business justifications for the conclusion that the PR-NPSC should not have remained open. For example, (1) remedying the deficiencies identified in the 2008 inspection would have been very expensive; (2) establishing and operating a new facility in Puerto Rico would have been even more expensive; (3) even though the PR-NPSC employees took Spanish- and English-language calls, the Puerto Rico facility was established specifically for bilingual services, and by 2008, the volume of Spanish-language calls had decreased; and (4) the existing NPSC system could absorb the workload if the PR-NPSC closed. As defendants correctly note, FEMA had ample basis to close a facility "which still had ongoing safety issues, was in poor condition, and

lacking critical modern infrastructure, and which was no longer needed, given declining claims processing needs[,] rather than to pay approximately $9 million to move to a new facility or to renew the lease and renovate the facility," which was "never designed for long-term FEMA use."

The report also noted that the lease on the PR-NPSC facility was set to expire in September 2008, which might be before repairs were completed. Even if, as plaintiffs contend, a lease renewal period had never prompted a facility inspection before, the fact remains that the expiration of a lease is an eminently reasonable point at which to assess options for the future of a facility.

Plaintiffs, noting that the PR-NPSC employees were required to be "fully bilingual," unlike their counterparts at other centers, suggest that defendants could have responded to the excess capacity in the NPSC system by "releas[ing] employees nationwide based on their performance." But such a course of action would not have addressed FEMA's concerns about the costs associated with maintaining the PR-NPSC facility. Those concerns are no less legitimate simply because the PR-NPSC was the "lowest cost of all the Centers in the nation"; FEMA still stood to realize

a substantial cost savings by closing the PR-NPSC.[10]  Again, this does not create a triable issue of national origin discrimination.

B.          Retaliation as to Rotational Staffing Plan and as to Closing

Title VII also makes it unlawful "'for employers to retaliate against persons who complain about unlawfully discriminatory practices.'"  Ahern v. Shinseki, 629 F.3d 49, 55 (1st Cir. 2010) (quoting Noviello v. City of Boston, 398 F.3d 76, 88 (1st Cir. 2005)).  To make out a prima facie case of retaliation, a plaintiff must make a three-part showing: "(1) she engaged in protected activity under Title VII, (2) she suffered an adverse employment action, and (3) the adverse employment action was causally connected to the protected activity."  Gerald v. Univ. of

---

[10]     Plaintiffs list several "facts" which they contend "are sufficient to establish a pattern which creates a controversy of material facts and rebuts FEMA's proffered reasons, which were but a pretext for discrimination."  The dissent similarly focuses on the question of whether FEMA harbored a discriminatory intent and offered pretextual justifications for its actions.  Plaintiffs' and the dissent's focus on "pretext" and on "FEMA's intent or motive" is misguided.  The proper inquiries in the disparate impact analysis are whether the challenged actions were job-related and consistent with business necessity, and, if so, whether the employer has refused to adopt an alternative employment practice that has less disparate impact and serves the employer's legitimate needs.  Questions regarding "intent or motive" come into play in a disparate treatment analysis, not a disparate impact analysis. See Ricci, 557 U.S. at 577-78; Hicks v. Johnson, 755 F.3d 738, 744 (1st Cir. 2014).
     In any event, we consider the facts identified by plaintiffs below, in our analysis of the retaliation claim, and find that they do not give rise to an inference of retaliatory or otherwise improper motive on the part of FEMA.

P.R., 707 F.3d 7, 24 (1st Cir. 2013). A "retaliation claim may be viable even if the underlying discrimination claim is not," because "the employment activity or practice that [the plaintiff] opposed need not be a Title VII violation so long as [the plaintiff] had a reasonable belief that it was, and he communicated that belief to his employer in good faith." See Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 174-75 (1st Cir. 2003). "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S.Ct. 2517, 2528 (2013).[11]

We hold that plaintiffs have failed to make the requisite showing that the purported adverse employment activity was causally connected to any protected activity, much less that protected activity was a "but for" cause of the rotational staffing plan or the closing of the PR-NPSC.

Plaintiffs identify two instances of protected activity which they say led to retaliation in the form of the decision to rotate employees while the center was under repair during the end of the lease period in the summer of 2008 and the decision to close

---

[11] Once the plaintiff makes a prima facie case, "the burden swings to the defendant 'to articulate a legitimate, non-retaliatory reason for its employment decision.'" Gerald, 707 F.3d at 24 (quoting Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 46 (1st Cir. 2010)). "If a defendant can do this then the burden travels once more to the plaintiff to show that the reason is pretext and that retaliatory animus was the real motivating factor." Id.

the center in late 2008. The instances are (1) the EEO complaints filed from October 2006 to May 2007 claiming that PR-NPSC employees were underpaid relative to their mainland counterparts, and (2) the EEO complaints filed in response to the July 2008 implementation of the rotational staffing system.

The first set of complaints is far too temporally remote from the challenged actions to support an inference of causality. "The cases that accept mere temporal proximity between an employer's knowledge of a protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (citations omitted) (noting that periods of three and four months have been held insufficient). In Breeden, the Court held that "[a]ction taken . . . 20 months later suggests, by itself, no causality at all." Id. at 274. Here, over 14 months elapsed between the last EEO complaint regarding pay and the implementation of the rotational staffing system during repairs. That is too long to support an inference that the complaints led to a decision to reduce staffing during fire-safety related repairs. See Shinseki, 629 F.3d at 58 ("Without some corroborating evidence suggestive of causation . . . a gap of several months cannot alone ground an inference of a causal connection between a complaint and an allegedly retaliatory action."); Morón-Barradas

v. Dep't of Educ. of Commonwealth of P.R., 488 F.3d 472, 481 (1st Cir. 2007) ("[M]ore than eight months . . . is [] insufficient to establish temporal proximity.").

Plaintiffs argue that the "chain of events" comprising their protected activity did not end until April 2008, when "[t]he Office of Equal Rights received the [February 2008] EEOC decision" dismissing plaintiffs' class complaint and ordering them to file individual complaints. Plaintiffs are wrong. Dismissal of an EEO complaint cannot be construed as protected activity on the part of the plaintiffs, and plaintiffs have presented no evidence that they actually filed individual complaints after the judge's decision, or that defendants anticipated they would.

Plaintiffs suggest that there is more evidence of causation than mere temporal proximity here because defendants' "actions . . . were . . . a deviation from the procedures followed within the PR NPSC and NPSC system for over ten years." Specifically, they assert that FEMA had never before conducted inspections of the PR-NPSC, that the conditions identified in the 2007 METAR had existed in the facility since its initial opening in 1995 but FEMA had ignored the problems, that the conditions were in fact not life-threatening, and that the 2008 fire report did not actually recommend limited occupancy or closure.

We are not persuaded. Plaintiffs point to no evidence to support their suggestion that the 2007 inspection was itself a

mere pretext to eventually close the center. The record in fact suggests that FEMA management was not aware of the safety issues until they were identified in the 2007 METAR, whereupon the management began taking steps to rectify the problems. The record also discloses a completely benign and logical reason for the 2008 inspection: FEMA management was concerned about the safety issues identified in the 2007 METAR.

Plaintiffs cite Harrington v. Aggregate Industries Northeast Region, Inc., 668 F.3d 25 (1st Cir. 2012), where we noted that "deviations from standard procedures, the sequence of occurrences leading up to a challenged decision, and close temporal proximity between relevant events" can "give rise to an inference of pretext." Id. at 33. But Harrington is easily distinguishable, and plaintiffs make no effort to explain why it should apply here. In finding that the plaintiff in Harrington, a whistleblower who was fired after he refused to take a drug test, had shown causation, we relied on evidence of very "close temporal proximity" (72 hours), deviations from the employer's drug testing protocol, inconsistences in the employer's accounts of the reasons for the drug test, and the "[c]oincidence[]" that the employee was singled out for a purportedly random drug test on his first day permanently back at work after his whistleblowing activities came to light. Id. at 32-34. Even there, we said the case was "close." Id. at 34. Here, in contrast, plaintiffs cannot show temporal proximity,

and the record discloses no shifting explanations for deviations from protocol or improbable "coincidences" giving rise to an inference of pretext.

The first set of complaints identified by plaintiffs occurred too early to ground a retaliation claim.  The second set occurred too late and cannot be causally related.  The decision to close the PR-NPSC was set in motion by recommendations in May 2008, at least two months before the implementation of the rotational staffing system, the subject of the second set of complaints.  As the Supreme Court has explained, employers' "proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."  Breeden, 532 U.S. at 272; accord Muñoz v. Sociedad Española De Auxilio Mutuo y Beneficiencia de P.R., 671 F.3d 49, 56 (1st Cir. 2012).  In Breeden, the Court held that it could not infer that the plaintiff had been transferred in retaliation for filing a Title VII lawsuit when the plaintiff's employer had stated that she was considering transferring the plaintiff before the employer knew about the lawsuit.  532 U.S. at 271-72.  Here, without more evidence of causality (and plaintiffs have pointed to none), there can be no rational inference that the closure of the PR-NPSC, first contemplated in May 2008, took place in retaliation for complaints filed in the wake of the July 2008 implementation of the rotational staffing plan.

Plaintiffs suggest that we can infer a retaliatory or otherwise improper motive on the part of defendants because of a number of circumstances: (1) "[w]henever in the past there had been a reduction in the workload, FEMA would release employees nationwide based on their performance," rather than closing an entire center; (2) even though FEMA cited budgetary concerns as a reason for closing the PR-NPSC, it was actually the cheapest NPSC to operate; (3) even though FEMA claimed that PR-NPSC was no longer needed because of a decrease in Spanish-language calls, the center also handled English-language calls; (4) FEMA did not comply with its own documented lease renewal policy with respect to the PR-NPSC, even though it did so for all other NPSC lease renewals; and (5) FEMA opened a new call center in Pasadena, California in 2012.[12]

These arguments add nothing to plaintiffs' case. Given the safety concerns at the PR-NPSC facility (the existence of which plaintiffs have conceded[13]), the impending expiration of the

---

[12] At oral argument, plaintiffs' counsel argued that, rather than closing the PR-NPSC, FEMA should have relocated it, as it did the Virginia NPSC. This argument is mentioned in only the most cursory fashion in plaintiffs' brief and is therefore waived. See Davidson v. Howe, 749 F.3d 21, 27 n.7 (1st Cir 2014); Zannino, 895 F.2d at 17. In any event, it is not persuasive for the same reasons that the arguments regarding the other proffered evidence are not.

[13] Plaintiffs' counsel conceded at oral argument that the May 2008 inspection disclosed safety issues that "shouldn't have been ignored," but maintained that the issues should have been addressed earlier.

facility's lease, and the $9 million cost of establishing a new Puerto Rico facility, it is not surprising that FEMA decided to close the PR-NPSC in the face of reduced staffing needs.[14]  While PR-NPSC employees were fully bilingual and could handle both Spanish- and English-language calls, it is undisputed that the Puerto Rico facility was originally established specifically for bilingual services, the need for which had sharply diminished by 2008.[15]  While FEMA could have made different business decisions, as we have said before, "[i]n the absence of proof sufficient to create a jury issue regarding retaliation, courts should not use cases involving unsupported reprisal claims to police the wisdom, fairness, or even the rationality of an employer's business judgments."  Mesnick v. Gen. Elec. Co., 950 F.2d 816, 829 (1st Cir. 1991).

---

[14]  The FEMA handbook, which plaintiffs cite for their contention that FEMA has a policy of uniform layoffs when staffing needs decrease, says no such thing.  It simply says that when employees are released based on fluctuating staffing needs, FEMA will consider "one or more" of the following factors: "Performance," "Job Function," "Work Schedule Availability," "Most Recent Hire Date," and "Production Levels."  There is no indication that FEMA has a hard-and-fast rule that any necessary layoffs would be evenly distributed among the NPSCs.

[15]  We also note that the California facility that plaintiffs refer to was not a NPSC, and, in any event, it opened over three years after the closing of the PR-NPSC.  That FEMA opened a different type of facility in California three years after closing a NPSC in Puerto Rico that had serious fire safety issues does not raise any inference of an improper motive on FEMA's part in closing the PR-NPSC.

In short, we cannot conclude on this record that the rotational staffing plan or the closing of the PR-NPSC was causally related to any of plaintiffs' protected activity. Plaintiffs' retaliation claims fail, as well.

The premise of this entire lawsuit was erroneous. Plaintiffs cannot force a government agency to keep open an unsafe facility which would have cost excessive sums to repair when there are alternate means by which the agency can accomplish its goals. "[G]overnmental entities . . . must not be prevented from achieving legitimate objectives." Tex. Dep't of Hous., 135 S. Ct. at 2524. What the Supreme Court said in Texas Department of Housing of the Fair Housing Act is equally true of Title VII:

> Disparate-impact liability mandates the removal of artificial, arbitrary, and unnecessary barriers, not the displacement of valid governmental policies. The [statute] is not an instrument to force [agencies] to reorder their priorities. Rather, the [statute] aims to ensure that those priorities can be achieved without arbitrarily creating discriminatory effects . . . .

Id. at 2522 (citation omitted).

## IV. Conclusion

We affirm the judgment of the district court.


**- Dissenting Opinion Follows -**


- 31 -

**TORRUELLA, <u>Circuit Judge</u> (Dissenting).** I am compelled to dissent because Plaintiffs-Appellants ("Plaintiffs") have raised genuine issues of material fact that require a trial before a fact finder. This is especially the case when one considers the actions of the majority in raising <u>motu proprio</u> an affirmative defense, namely the so-called safe harbor defense, for the first time on appeal notwithstanding Defendants-Appellees' ("Defendants" or "FEMA") failure to raise that defense, either before the district court or before this court.

## I. Background

### A. The Discrimination Claims

As the majority opinion recounts, the facts of this case go back to 1995 when, in response to Hurricane Marilyn's effects on Puerto Rico and the U.S. Virgin Islands, FEMA opened the Puerto Rico National Processing Service Center ("PR Center"), which started originally as a tele-registration center, or call center.

The scope of FEMA's operations in the PR Center evolved over the following decade to the point that it became one of its four national claims-processing centers in the United States, carrying out the same duties that the other FEMA centers performed in the mainland, with the additional benefit that -- its personnel being bilingual -- it was able to handle calls and process claims from both English and Spanish speakers. Contrary to the majority's assertion, it is undisputed by both Plaintiffs and Defendants that

Plaintiffs are all of Puerto Rican national origin and comprise approximately ninety-eight percent of the PR Center's workforce.

As the majority describes, when the PR Center employees realized they had been under-compensated for the same work performed by their counterparts in other FEMA centers across the United States, some employees complained to management about this situation and eventually filed complaints for equal pay before the agency's Equal Employment Opportunity Office ("EEOO"), alleging that by paying them less, FEMA engaged in disparate impact discrimination on the basis of their national origin. FEMA settled some of these claims in 2006. Later, another group of employees also filed formal discrimination complaints before the EEOO and requested certification as a class action.

What is striking about this second round of complaints is the curious chain of events that began only two months after these filings. In June 2007, the agency's Occupational, Safety & Health Office performed an uncommon inspection of the PR Center's premises. For the first time in twelve years it carried out a Management Evaluation and Technical Assistance Review ("METAR"). While multiple building deficiencies and safety needs were found in this 2007 METAR, by the time FEMA performed a follow-up building review in May 2008, most of the deficiencies had been properly addressed and corrected. In the meantime, FEMA's Puerto Rican employees continued their battle for equal pay. The second round

of discrimination complaints that had been filed briefly before the 2007 METAR were dismissed in February 2008, following a denial of the class certification.  Instead, the FEMA administrative judge ordered the complainants to re-file their claims individually, which Plaintiffs contend that they did.

## B.  Procedural History

In essence, Plaintiffs' case is that, faced with this scenario, FEMA crafted a business necessity to justify placing them in a rotational staffing plan, and then closing the PR Center and ordering their termination.  According to Plaintiffs, FEMA did this by inspecting the PR Center premises and issuing a list of safety concerns that allegedly required closing the center immediately for repairs, and only allowing a limited number of employees to continue to work on a rotational basis.  Because FEMA had never raised concerns regarding the building's conditions prior to that point, and the safety issues were either non-life-threatening or quickly resolved, Plaintiffs argued that FEMA should have suspended the rotational staffing plan and allowed them to return to work.  In response to the rotational staffing plan, Plaintiffs also filed approximately 300 complaints.  Meanwhile, FEMA did some number-crunching and came up with a reduction in operational needs for its nationwide claims processing centers that allegedly justified closing the PR Center altogether.  Plaintiffs responded that this was in retaliation for

their complaints over the rotational staffing plan, and that far from this representing a valid business necessity that would justify their termination, FEMA historically had released employees based on performance and not on location. They claim this could have been done by releasing employees from all centers rather than simply closing the PR Center.

In sum, Plaintiffs' request for relief on appeal is that we remand this case so that a fact finder can decide whether their alternatives to FEMA's business needs defeat FEMA's justifications, and whether FEMA's adverse actions against Plaintiffs is the result of retaliatory actions arising from their claims for equal working conditions and their requests to return to work during the rotational staffing plan. The former can be shown by establishing that Plaintiffs' alternatives served FEMA's alleged business necessity without the discriminatory impact on them or that FEMA's justifications for both the rotational staffing plan and the PR Center closure were pretextual. The latter could be found by a reasonable jury based on the close temporal proximity of the adverse actions to the protected complaints for equal working conditions and the complaints filed in response to the rotational staffing plan. Pretext can also be inferred from Plaintiffs' challenges to the graveness of the alleged safety deficiencies.

FEMA, on the other hand, asserts that it based its decisions on ensuring "the safety and security of [its] employees," and the district court agreed with this by finding that there were "fire and safety deficiencies." FEMA also justified its closure decision on the reduced needs for the PR Center within its nationwide operations.

The majority now forecloses Plaintiffs' claims by raising a safe harbor defense on behalf of FEMA, which FEMA never raised and, in any event, does not protect one of the adverse actions raised by Plaintiffs, i.e., the decision to terminate them.

## II.  Defendants Never Raised the Safe Harbor Defense

Even if the safe harbor provision of 42 U.S.C. § 2000e-2(h) raised by the majority allows an employer to discriminate in practice against employees on the basis that they work in different locations, it is an affirmative defense that was not once mentioned by FEMA at any stage in this proceeding. See Am. Tobacco Co. v. Patterson, 456 U.S. 63, 86-87 (1982) ("Section 703(h) provides an affirmative defense . . . .") (Stevens, J., dissenting); Marcoux v. Maine, 797 F.2d 1100, 1108 (1st Cir. 1986) ("The district court thought it a matter of affirmative defense for defendants to establish that the disparity in benefits . . . was based on a factor other than sex."). See also Jackson v. Seaboard Coast Line R.R. Co., 678 F.2d 992, 1012 (11th Cir. 1982) ("The district court held that the [defendant] waived its right to advance this claim

by failing to plead it as an affirmative defense under Fed. R. Civ. P. 8(c).  We agree."); Gunther v. Cnty. of Wash., 623 F.2d 1303, 1313 (9th Cir. 1979); Firefighters Inc. For Racial Equal. v. Bach, 611 F. Supp. 166, 170-71 (D. Colo. 1985) ("§ 703(h) fell within the general rule that statutory exemptions from remedial statutes are affirmative defenses because '§ 703(h) serves to exempt from Title VII the disparate impact of a bona fide seniority system.'" (quoting Jackson, 678 F.2d at 1013)).

However, the majority defends its unusual action of raising the safe harbor on behalf of the Defendants by pointing to the factors considered in Chestnut v. City of Lowell, 305 F.3d 18, 24 (1st Cir. 2002).  Specifically, it claims that at least four of the following six factors applied in that case allow this court to consider a waived defense, even if it was not raised by the parties on appeal: (1) whether the waived issue is purely legal; (2) whether the issue is of constitutional magnitude; (3) whether the "omitted argument [is] highly persuasive"; (4) whether consideration of the argument would prejudice the plaintiff; (5) whether the omission was inadvertent; and (6) whether the issue "implicated a matter of great public concern."  I disagree with the majority's analysis of these factors as none justify applying the waived defense in this context.[16]

---

[16]    The cases cited by the majority are distinguishable because in those cases the court used this framework to analyze

First, I agree that, assuming it is appropriate to consider this defense, we have a purely legal matter. But the outcome of this question is not entirely favorable to Defendants because, as will be explained in more detail, the safe harbor defense is not applicable to discharge situations and has never been applied in contexts similar to the instant case.

Second, there is no basis in the record to hold that this is an issue of constitutional magnitude requiring that the court steps into arguments not properly raised by the parties. If there is a constitutional issue, it is raised by the majority's actions in denying Plaintiffs the process which is due to litigants by preventing them from being heard on issues that were not before the court.

Third, whether the omitted argument is "highly persuasive" is easily questioned because, as previously stated and will be further discussed, the safe harbor defense is inapplicable to cases of termination.

Fourth, on the question of whether passing by the court on the omitted argument would be prejudicial to Plaintiffs, the majority concludes that there is no prejudice. I ask, can it be seriously argued that Plaintiffs are not prejudiced when this court

---

whether it should allow an argument that was waived below but was raised on appeal. Here, by contrast, Defendants did not even mention the safe harbor on appeal.

- 38 -

decides their case mainly on arguments and issues not raised by Plaintiffs' party opponents and as to which Plaintiffs were not given an opportunity to rebut?  The answer is a self-evident and obvious "of course there is prejudice."

Fifth, whether the omission was inadvertent is not easily resolved.  Here, there are two possible explanations for their omission: either Defendants did not argue the safe harbor defense because it simply does not apply or Defendants made a conscious choice to only raise the business necessity as a defense. It is possible that FEMA chose not to attack the proof offered in support of Plaintiffs' prima facie case by raising this defense, because a "defendant may confess [disparate impact] and avoid [this issue], acknowledging the legal sufficiency of the prima facie case but endeavoring to show either that the challenged practice is job-related and consistent with business necessity, or that it fits within one or more of the explicit statutory exceptions covering bona fide seniority systems, veterans' preferences, and the like."  EEOC v. S.S. Clerks Union, Local 1066, 48 F.3d 594, 602 (1st Cir. 1995) (emphasis added) (internal citations omitted). Therefore, a defendant is free to rebut the prima facie case by doing three things: (1) attack the plaintiff's prima facie proof (which did not happen in this case) (2) prove a business necessity (which is what FEMA chose), or (3) raise a safe harbor defense (which is what the majority did for them).  Here, Defendants only

chose the second option.  Therefore, I do not see how we can readily conclude that the omission to raise the defense the majority is now raising for them was necessarily "inadvertent". This conclusion is reinforced by the fact that <u>Defendants were represented by competent counsel who must have been aware that this defense was not available in similar termination cases</u>.

Sixth, it is hard to comprehend how this defense is a matter of public concern that requires the court raising the defense on their behalf.

In any event, even if validly raised by the majority on behalf of Defendants, for the reasons explained below, the safe harbor defense does not help FEMA in this case.

## III. <u>The Safe Harbor Does Not Apply to Disparate Impact Involving Termination</u>

This defense applies to disparate impact on employee benefits and working conditions.  The main case cited by the majority in support of raising the safe harbor for the Defendants, <u>Candelario Ramos</u> v. <u>Baxter Healthcare Corp. of Puerto Rico</u>, 360 F.3d 53 (1st Cir. 2004), has to do with disparate impact in pension benefits, not termination.  The instant case appears to be the only case where a court has applied this affirmative defense in the context of termination.[17]

---

[17]   We note that this safe harbor has been raised by defendants in cases where a plaintiff was terminated because a bona fide seniority system adopted as part of a labor agreement

- 40 -

As required by our legal training, we begin by examining

the full text of the safe harbor provision, which reads as follows:

> (h) Seniority or merit system; quantity or quality of production; ability tests; compensation based on sex and authorized by minimum wage provisions
>
> Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin, nor shall it be an unlawful employment practice for an employer to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin. It shall not be an unlawful employment practice under this subchapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of title 29.

42 U.S.C. § 2000e-2(h) (emphasis added).[18]

---

contains "last hired-first fired" language regulating furloughs in the context of reduction of force decisions. See Cates v. Trans World Airlines, Inc., 561 F.2d 1064, 1066 (2d Cir. 1977). That, however, is entirely different from the instant case, where -- even assuming no retaliation -- employees were terminated based on location, not to comply with a bona fide seniority system.

[18] Note that the general provision of the statute establishes that it "shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge an individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges

There is not an iota of language in this statutory provision which can lend support to the majority's application of this provision to freely allow terminations without Title VII liability. The majority's interpretation is an absolute distortion of the plain and unequivocal language of this statute. We need go no further as this statute speaks for itself. "[R]eliance on legislative history is unnecessary in light of the statute's unambiguous language." Mohamad v. Palestinian Auth., 132 S. Ct. 1702, 1709 (2012) (quoting Milavetz, Gallop & Milavetz, P.A. v. United States, 559 U.S. 229, 236 n.3 (2010) (internal quotation marks omitted)). See also Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 119 (2001) ("[W]e do not resort to legislative history to cloud a statutory text that is clear." (alteration in original) (quoting Ratzlaf v. United States, 510 U.S. 135, 147–148 (1994))).

Nevertheless, the legislative history of this provision fully supports its plain meaning and has been explained in great detail by the Supreme Court. Its enactment stems from Congress's concern for allowing the uninterrupted continuation of existing

_____

of employment . . . ." 42 U.S.C. § 2000e-2(a). Yet, 42 U.S.C. § 2000e-2(h) provides a safe harbor for different standards of compensation, and other terms and conditions of employment, but is completely silent as to hiring and termination decisions. The narrower language of the safe harbor supports the conclusion that it was not intended to serve as a defense to avoid liability for hiring and firing decisions.

seniority discrepancies and vested benefits when Title VII became effective. Specifically, Congress responded with this section as an amendment to the original bill after it passed the House because of the opposition to Title VII's potential effects on union seniority systems, and since the Congressional intent behind Title VII was not to affect the vested rights of employees. See generally Beth W. Brandon, The Seniority System Exemption to the Title VII of the Civil Rights Acts: The Impact of a New Barrier to Title VII Litigants, 32 Clev. St. L. Rev. 607, 611-13 (1983-84). See also Patterson, 456 U.S. at 81-83 (explaining the legislative history and the "fears [that] were expressed concerning . . . seniority rights and existing seniority systems" (citing Franks v. Bowman Transp. Co., 424 U.S. 474, 759 (1976))); Pullman-Standard, Inc. v. Swint, 456 U.S. 273, 284 (1982) (examining whether a union's seniority system was protected by § 703(h) defense); Gen. Elec. Co. v. Gilbert, 429 U.S. 125, 143-45 (1976) (examining § 703(h) defense on discrimination in disability plan and benefits); Robinson v. Shell Oil Co., 519 U.S. 337, 343 (1997) ("Of course, there are sections of Title VII where, in context, use of the term 'employee' refers unambiguously to a current employee, for example, those sections addressing salary or promotions. See § 703(h), 42 U.S.C. § 2000e-2(h) (allowing different standards of compensation for 'employees who work in different locations'")); AT&T Corp. v. Hulteen, 556 U.S. 701, 708-

10 (2009); Goodman v. Merrill Lynch & Co., 716 F. Supp. 2d 253, 261 (S.D.N.Y. 2010) (explaining what is a bona fide "merit, seniority, or production-based compensation system").

Cases dealing with hiring practices to which the employer applies a "bona fide merit system" allowed under § 703(h) are nonetheless subject to the same disparate impact analysis requested by Plaintiffs in the instant case. This analysis is to be applied in the same manner that it was established by the Supreme Court in Griggs v. Duke Power Co., 401 U.S. 424 (1971), instead of just applying this safe harbor defense. See Guardians Ass'n of N.Y. City Police Dept., Inc. v. Civil Serv. Comm'n, 633 F.2d 232, 253-54 (2d Cir. 1980). Because that is the framework used for hiring decisions, it is odd to differentiate the analysis required in the instant case -- as the majority proposes -- by holding that when it comes to termination, rather than performing a disparate impact analysis, courts may just turn to a safe harbor that was intended to regulate benefits and conditions of employment. Notably, the majority's only basis for applying the safe harbor in this context is that Candelario Ramos -- which involved pension benefits -- calls for a broad application, and that there are some cases in which it was been applied to promotion

decisions, which are more akin to benefits and conditions of employment than to hiring and termination decisions.[19]

In synthesis, I disagree with the majority's application of the safe harbor in this context. Because the safe harbor should not be dispositive of this case, the court needed to examine closely the material facts in controversy raised by Plaintiffs.

## IV. Factual Controversies

### A. FEMA's Sudden Concern over Employees' Safety

The first problem with the story that FEMA offers to support the alleged adverse actions is that, even accepting the severity of the safety concerns on which their business-necessity justification was partly premised, the findings of the June 2007 METAR inspection are very similar to those of the 2008 review, and yet, the need for action (closing the center for repairs) on previously non-threatening conditions arose unexplainably in 2008. The findings were that: a reevaluation of the fire alarm system and related emergency procedures needed to be conducted; assessment and modification of the building's egress routes was needed; the facility did not have a hazardous communication, material or ladder safety program; OSHA Form 300 log and injury and incident report form 301 procedures were not updated; exit

---

[19] It is also particularly incongruous that these employees were discriminated against for being in different locations when they had to have higher qualifications because they had to be bilingual to receive calls in Spanish and English.

signs were not present at several locations throughout the facility; internal safety orientation training not provided, among other similar needs. By the time the 2008 review was performed, all matters were either corrected or had a corrective plan in effect. In fact by May 21, 2008, FEMA's own internal communications show that the "only item pending on the [2007] METAR which [had] not been solved" was the construction of a new egress route. It bears noting that this egress route had never been a concern of FEMA, as the building never had one since it was first occupied by FEMA in 1995. In fact, the egress pathway and ramp that were mentioned in the 2007 METAR were only recommended as "mid-long term recommendations." Also, the property lease for this facility had been renewed periodically but the facility was not inspected every time it was renewed.[20] For twelve years, FEMA officers and managers visited the PR Center without ever raising any concerns about dangerous conditions on site.

Furthermore, Plaintiffs argue that the 2008 review findings that were necessary for re-occupancy of the PR Center were minimal.[21] These included conducting a fire watch in the

---

[20] The lease of the PR Center property was up for renewal in September 2008, but the facility was closed temporarily on May 16, 2008, and then partially re-opened during the rotational staffing plan.

[21] A former FEMA Branch Chief stated that the building condition issues were "easily correctable." The cost of the repairs was estimated at $75,000.

building during occupancy, removing magnetic locks from exit doors, removing all storage in the egress corridors, updating and practicing the Occupant Emergency Plan, installing a secondary egress man-gate on the perimeter fence at the rear of the building, adding additional fire extinguishers, and obtaining fire hydrant flow test information.  Crucially, the 2008 review report did not recommend closing the PR Center or reducing its capacity by implementing the rotational staffing plan.  And, by July 2008, the concerns identified in the May 2008 review -- which Plaintiffs insist were not life threatening -- had already been resolved.  In sum, even assuming the validity of FEMA's business necessity to assure the safety of its employees, a jury could reasonably agree with Plaintiffs' compelling dispute of FEMA's justification for denying their alternative option to the rotational staffing plan which was to reoccupy the PR Center's premises and continue working.

### B.   The Newly Discovered Reduction of Operational Needs

As the email exchanges between FEMA officials contained in the record reveal, FEMA began looking for justifications for the permanent closure of the PR Center after the initial emergency closure for repairs on May 16, 2008, following the 2008 review. At that point, the record shows that FEMA did not possess metrics, data, or statistics showing that the PR Center was not necessary

to its operations nationwide or even measuring the potential effects of its closure on the agency's operations. What's more, some FEMA officers did not even know why the agency had come to concentrate on Puerto Rico at the time. That is, FEMA first closed the center and instituted the rotational staffing plan before it had collected the evidence to come up with one of its "business necessity" justifications. Plaintiffs presented an email sent by the Deputy Administrator of FEMA on May 26, 2008, asking things like the "desired capacity and exactly how we can achieve [it] without Puerto Rico"; "[w]hat do we expect to be [our] Spanish language requirement and what options will we have?"; "[w]ant to show that they are typically a small part of the whole system, and that the system has the capacity to absorb the Puerto Rico workload"; "[h]ow long have the facility deficiencies existed and why are we just being attentive now?"; "[h]ave there been any trends that reduce the role of the NPSC?"; "[c]an we show trends in greater usage of on-line?"; "[w]e need to show that we can live without Puerto Rico, even in a catastrophic situation"; and "[w]e will need to identify each of the other sites and indicate why we would not close them or reduce their capacity." Nevertheless, the agency based its justification for the rotational staffing plan and closing the PR Center on the firm conviction that, in addition to it being a safety concern, it was no longer necessary to its operations. Indeed, the data on operational needs and statistics

was only known -- by December 2008 -- when the decision to close permanently was made, and after all the alleged "life-threatening" safety concerns had already been addressed.  It is hard to see how the safety of the employees was still an issue by the time the data needed to support the second part of the alleged business necessity was collected.

As part of its operational justifications for the closure, once the rotational staffing system had been implemented, FEMA quantified an alleged reduction in Spanish calls.  Plaintiffs contend, however, this is irrelevant because the employees in the PR Center were bilingual and had been processing calls and claims from all across the United States for years.  Furthermore, Plaintiffs argue that as of October 2008, even before the final closure of the center, FEMA already had had to contract external language services.

The majority states that it agrees with the district court that the rotational staffing plan served FEMA's needs by allowing it to have some employees in the PR Center, despite the building's unsafe conditions, so that they could assist in a disaster scenario.  This seems completely incongruent with FEMA's claim that it had no operational need for the PR Center only a few months after the rotational staffing plan began.  It is nonsensical to say that the justification for closing the PR Center permanently was that FEMA did not need those employees because of reductions

in operations while recognizing that FEMA had a legitimate need of maintaining at least some of them in that same center to assist in the event of a disaster.

Plaintiffs also allege that, whenever FEMA faced a need for reduction in workforce in the past, it released employees nationwide based on performance. While Plaintiffs do not argue that FEMA regulations required it to do so, they claim that the agency departed from its prior practice only to discriminate against them by closing the PR Center and ordering their termination. The majority's answer to Plaintiffs' alternative consisting in that FEMA should have terminated employees on a national level based on performance is a non sequitur. It claims that FEMA could not do that because it had also just realized that it had a budgetary need to close the PR Center. Plaintiffs' argument, however, is not that FEMA could release employees across the United States based on performance while leaving the PR Center in service. What they argue is that it could have closed the PR Center and still kept some of the Puerto Rican employees in other centers in the mainland by releasing employees because of their performance and not in a way that had a disparate impact over Puerto Rican employees, or over employees that had filed hundreds of complaints for disparate working conditions and compensation.

Relatedly, Plaintiffs also dispute that some employees were allowed to transfer to other National Processing Service

Centers because at the time the decision to permanently close the PR Center was made, they were given only twenty-four hours to decide whether they wanted to move to the mainland. Furthermore, not all were offered positions in another center and most were asked to reapply and compete for new openings in those positions.

Taken together, all these facts become increasingly suspicious when considering that the employees in the PR Center had always been classified as call center employees, while their non-Puerto Rican counterparts in the mainland were classified at higher pay scales for doing the same claims-processing tasks. Over the previous two years, Puerto Rican employees had been battling FEMA over equal pay. Moreover, in the case of Program Specialists, they complained about the discrepancy in pay, and when FEMA agreed to bring them to the corresponding classification, they were placed in the lowest step of the classification, and denied increases earned as well as back pay. In addition, when the final closure decision was made, the PR Center employees had filed over 300 complaints with the EEOO because of the rotational staffing system imposed after the initial closure following the May 2008 review.

Thus, I disagree with the majority that Plaintiffs are not entitled to have their day in court -- not even for their retaliation claims -- to show that FEMA's justification to terminate them and close the PR Center based on safety concerns and the alleged reduced operational needs, were simply pretextual

because its true reason was to avoid the discrimination complaints brought by the Puerto Rican employees. These questions of fact are in no way foreclosed by the Supreme Court's recent decision in Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc., 135 S. Ct. 2507 (2015), as the majority implies. At a minimum, "[a] court must determine that a plaintiff has shown that there is 'an alternative . . . practice that has less disparate impact and serves the [entity's] legitimate needs.'" Id. at 2511 (alterations in original) (quoting Ricci v. DeStefano, 557 U.S. 557, 578 (2009)).

I agree with the majority that disparate impact claims must be examined cautiously to avoid interjecting racial considerations into every agency decision and to avoid causing potential defendants to establish racial quotas. Maj. Op. at 19-20 (citations omitted). However, there are two problems with relying on those public policy considerations to dismiss this case. First, Plaintiffs' claims are not limited to disparate impact concerns. Indeed, they raise serious controversies of material fact regarding conspicuous acts of retaliation. Second, Plaintiffs never asked for anything close to establishing quotas to guarantee the employment of Puerto Rican employees. They present triable issues of material fact as to whether -- even assuming the validity of FEMA's justifications -- their proposed

non-discriminatory alternatives served FEMA's alleged business necessity.

### C. Pretext Analysis in Disparate Impact Claims

Even though Plaintiffs expressly conceded in oral argument that they do not advance any of their claims as disparate treatment claims, this does not change the required analysis for pretext under disparate impact and retaliation. Therefore, Plaintiffs should be allowed their day in court to prove that their alternatives to FEMA's alleged business needs defeated the same, and that the adverse actions were retaliatory. In addition, they should be allowed to establish as part of their disparate impact claims that the justifications for the adverse actions were pretextual.

In cases for disparate impact the analysis is also subject to the well-known burden-shifting standard, which allows for a plaintiff to prove pretext. See Albemarle Paper Co. v. Moody, 422 U.S. 405, 425 (1975) (applying burden-shifting analysis for pretext in a disparate impact case); see also S.S. Clerks Union, Local 1066, 48 F.3d at 602 (same); Abbott v. Fed. Forge, Inc., 912 F.2d 867, 876 (6th Cir. 1990) (considering burden-shifting analysis and pretext in a disparate impact case); Bronze Shields, Inc. v. N.J. Dept. of Civil Serv., 488 F. Supp. 723, 726-27 (D.N.J. 1980) (applying burden-shifting analysis and

considering a 42 U.S.C. § 20002-2(h) defense in a disparate impact claim under Griggs).

In fact, in S.S. Clerks Union, Local 1066, 48 F.3d at 601-602, we discussed extensively the applicability of the burden-shifting analysis to disparate impact claims. In that case, we also mentioned the importance of raising exceptions -- including seniority systems -- as defenses. Id. Having explained the requirements for a prima facie showing, we went on to state:

> At that point, the defendant has several options. First, it may attack the plaintiff's proof head-on, debunking its sufficiency or attempting to rebut it by adducing countervailing evidence addressed to one or more of the three constituent strands from which the prima facie case is woven, asserting, say, that no identifiable policy exists, or that the policy's implementation produces no disparate impact, or that the plaintiff's empirical claims—such as the claim of causation—are insupportable.

> Alternatively, the defendant may confess and avoid, acknowledging the legal sufficiency of the prima facie case but endeavoring to show either that the challenged practice is job-related and consistent with business necessity, or that it fits within one or more of the explicit statutory exceptions covering bona fide seniority systems, veterans' preferences, and the like. In all events, however, a defendant's good faith is not a defense to a disparate impact claim.

> If the defendant fails in its efforts to counter the plaintiff's prima facie case, then the factfinder is entitled—though not necessarily compelled, to enter judgment for the plaintiff. On the other hand, even if the defendant stalemates the prima facie case by elucidating a legitimate, nondiscriminatory rationale for utilizing the challenged practice, the plaintiff may still prevail if she is able to establish that the professed rationale is pretextual. The plaintiff might demonstrate, for example, that some other practice,

- 54 -

without a similarly undesirable side effect, was available and would have served the defendant's legitimate interest equally well. Such an exhibition constitutes competent evidence that the defendant was using the interdicted practice merely as a 'pretext' for discrimination.

Id. at 602 (citations and internal quotation marks omitted) (emphases added). Based on the above-cited text, the Defendants in this case should have raised their business necessity or the safe harbor defense. They chose only the former and it is still subject to pretext. Thus, Plaintiffs should also be allowed to prove their pretext argument before a fact finder.[22]

## V. Conclusion

For the foregoing reasons, I would remand this case for trial. The majority is wrong as a matter of law that Defendants' adverse actions against Plaintiffs are protected by an affirmative defense that Defendants did not raise either before this court or the district court. In addition, that safe harbor defense does not protect an employer's decision to terminate employees, as shown by the clear text of 42 U.S.C. § 2000e-2(h), its legislative history and case law.

---

[22] The majority argues that this last step of the burden-shifting analysis regarding pretext can be avoided in disparate impact cases because the Supreme Court left it out of its restatement of applicable law in Ricci, 557 U.S. at 578. However, in Ricci, the Court was quoting the statute in § 2000e-2(k)(1)(a)(i), which codified the cause of action for disparate impact recognized in Griggs. That statutory text was enacted in 1991, which suggests this court was aware of it when the opinion was issued in S.S. Clerks Union, Local 1066, in 1995.

Plaintiffs deserved a chance to prove that their alternatives to FEMA's adverse actions reasonably accommodated FEMA's business necessities -- to the extent that these were valid -- without having a disparate impact against them, and they should have a chance to prove that reasons to place them in a rotational staffing plan and then terminate them were pretextual. Specifically, a jury should decide the genuine disputes as to material fact regarding: (1) whether FEMA's 2007 METAR inspection and the 2008 follow-up building review were causally related to Plaintiffs' protected conduct; (2) whether the findings of these inspections support FEMA's alleged business justifications for the rotational staffing plan and the Plaintiffs' termination, particularly, in light of Plaintiffs' challenges to the severity of the safety concerns and their questioning of the alleged reduction in operational needs; (3) whether the safety concerns required FEMA to close the PR Center for repairs since the record shows that these had never been a concern of FEMA, the 2007 METAR results did not require closing for repairs and having a rotational staffing plan, while almost identical findings did require so in 2008, the safety concerns had been corrected by the time the decision to permanently close the center was made, and since the only missing items, i.e., the egress pathway and ramp, were only listed as "mid-long term recommendations"; (4) whether Plaintiffs' non-discriminatory alternatives to the adverse actions would not

serve FEMA's business necessities; and (5) whether FEMA's justifications were pretextual.

For the reasons stated, I dissent.